Conlin Estate.

484

Argued November 16, 1956; reargued March 26, 1957. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, ARNOLD, JONES and COHEN, JJ.

*Thomas J. Donnelly,* with him *Tom H. Bietsch, Harold S. Irwin, Sr., Fred C. Houston, Jr.,* and *Houston & Houston,* for appellant.

*Hermas L. Weary,* with him *Weary, Hess & Humer,* for appellee.

OPINION BY MR. JUSTICE BELL, April 15, 1957:

The question involved may be thus stated: What is the meaning of the words "share equally in money", considered in connection with the entire will and the circumstances surrounding testatrix when she made it?

Mrs. Conlin committed suicide on November 9, 1952, thirteen days after the death of her husband. She left the following very unusual handwritten document dated November 4, 1952, signed at the end thereof "Irene W. Conlin":

"One thousand (1000.00)
Trinity Luthern Church, Camp Hill, Pa.

Share equally in money
( )
( Mrs. Mark Schreiner )
( )
( Mrs. James Evans )
( )
( Mrs. Frank Auer )
( )
( John Conlin )
( )
( Harry Deibler )
( )
( )
( Lois Spangler )
( )
( Mary Graham )
( )
( Woodrow Weinmann )
( )
If any are deceased it does not go to next of kin

Jewelry to Mary Graham

(Personal effects to Lois.
(linens, bedding, dishes silver
Rugs, furniture to Woodrow
Weinmann
Irene W. Conlin—Nov. 4, 1952"

The paper was admitted to probate by the Register of Wills as Mrs. Conlin's last will. A caveat was filed by Mildred M. Williams and Irene Williams, first cousins of decedent, and after hearing and argument the appeal was dismissed by the Court below. No appeal was taken from the lower Court's action by any party in interest. At the hearing sur the appeal the legatees who were given a "share in money" proved, and the lower Court found as a fact, that testatrix, after making her will, "called Mr. Reynold's* attention to the writing vertically along the right-hand edge of the paper, stating that if any of those persons were

---

* Attorney for the estate of Mrs. Conlin's husband.

dead, she did not want them to have any part of her estate."* Those legatees are now estopped to contend as they did in this Court that that phrase, viz., "If any are deceased it does not go to next of kin", referred to testatrix's next of kin instead of to the next of kin of the named legatees.

In *Newlin Estate,* 367 Pa. 527, 80 A. 2d 819, this Court said (page 529) : "The testator's intent must be ascertained by a consideration of the entire will which of course must be read in the light of the circumstances surrounding him when he made it: Packer's Estate (No. 1), 246 Pa. 97, 92 A. 65; Hermann's Estate, 220 Pa. 52, 58, 69 A. 285; Mulert Estate, 360 Pa. 356, 61 A. 2d 841; March Estate, 357 Pa. 216, 53 A. 2d 606." The surrounding circumstances include the amount, kind and condition of his property, his family and all the natural objects of his bounty, as well as his relations with and the condition of his family and his beneficiaries and all claimants to any part of his estate: *Newlin Estate,* 367 Pa., supra; *Fahey Estate,* 360 Pa. 497, 500, 61 A. 2d 880; *Clark Estate,* 359 Pa. 411, 419, 59 A. 2d 109; *Mayer's Estate,* 289 Pa. 407, 137 A. 627; *Frisbie's Estate,* 266 Pa. 574, 109 A. 663.

Placing ourselves in the armchair of the testatrix *for the purpose of ascertaining her intention as expressed in the language of her will,* we find the following circumstances which surrounded her and of which she had knowledge at the time she executed her holographic will.

Irene W. Conlin was 47 years of age. Mrs. Conlin had cash including bank accounts of $6,246.; stocks having a value of $5,612.; bonds having a value of $18,537.; household furniture and effects $2,110.; jewelry $360.; real estate $22,000., and a share in her hus-

---

* *Conlin Estate,* 89 D. & C. 318, 329.

band's estate (which eventually totaled $45,000.). Her gross estate amounted to $99,867.

Mrs. Conlin was survived by *three first cousins,* Louis G. Weinmann, Mildred Williams and Irene Williams, and three first cousins once removed,* Lois Spangler, Mary Graham and Woodrow Weinmann, who were children of Louis Weinmann. The Auditing Judge found that Mrs. Conlin had grown up with Louis Weinmann and his children; that she considered Louis' home to be her home before her marriage; and that Louis Weinmann and his three children were closer to her than anyone else. Testatrix, prior to her marriage, lived part of the time with her first cousins, Mildred Williams and Irene Williams, who are teachers and unmarried. Their ages are unknown. Testatrix made no gift to her first cousins—Louis Weinmann (who was 62 years old), Mildred Williams and Irene Williams, of each of whom she was very fond. However, she did make a gift to the three children of Louis Weinmann of her jewelry, personal effects and furniture and also a share in her money. The age of these children is respectively Woodrow 33, Lois Spangler 34 and Mary Graham 37.

The closest relatives of Mrs. Conlin's deceased husband, George Conlin, were his three sisters, Mrs. Mark Schreiner, aged 52; Mrs. James Evans, aged 65; Mrs. Frank Auer, aged 60; a brother, John Conlin, aged 55; a brother, William Conlin, aged 76, and a nephew, Harry Deibler, aged 47, with all of whom she was on friendly terms. Ages are given because the lower Court attached great importance to testatrix's gift of money to the three children of Louis Weinmann, who were of her own generation, instead of to Louis Wein-

---

* Erroneously referred to by appellees and by the lower Court as second cousins.

mann, who was of *an older generation,* closing its eyes to the gift of money to four of her husband's relatives who were of *the older generation.* This furnishes no justification in logic or in law for the exclusion of Louis Weinmann and testatrix's two other nearest relatives.

In *Beisgen Estate,* 387 Pa. 425, 128 A. 2d 52, the Court said: "In Cannistra Estate, 384 Pa. 605, 607, 121 A. 2d 157, the Court said: 'No rule regarding wills is more settled than the great General Rule that the testator's intent, if it is not unlawful, must prevail: . . . Moreover, "The testator's intention must be ascertained from the language and scheme of his will: 'it is not what the Court thinks he might or would have said in the existing circumstances, or even what the Court thinks he meant to say, but *what is the meaning of his words'*\*: Britt Estate, 369 Pa. [450, 454, 87 A. 2d 243]": Sowers Estate, 383 Pa. 566, 119 A. 2d 60.' "

Appellees mistakenly believe that by placing himself in the armchair of the testatrix, a Judge can thereafter distribute the testatrix's estate in accordance with good morals and equity among her relatives and friends as a reasonable man seeking to be fair would do. Of course, that is not and never has been the law. The fact that testatrix's estate acquired, long after her death, $45,000. of her $100,000. estate from her husband does not entitle an armchair Judge to interpret her will in such a way as to give her husband's relatives 5/8ths of her estate or even 45/100ths of her estate—unless of course the language of her will makes such a disposition. It is not what a Judge, if he had been sitting in Mrs. Conlin's armchair, and moralizing, thinks that the testatrix should in equity and in good

---

\* Italics throughout, ours.

conscience have done, "it is not what the Court thinks she might or would have have said in the existing circumstances [i.e., if the omission or ambiguity or unprovided for contingency or event could have been called to her attention], or even what the Court thinks she meant to say, but what is the meaning of her words".

Testatrix was a graduate of Slippery Rock State Teachers College. Thereafter she took graduate courses at Columbia University. She was an intelligent woman. She taught school for several years. She was familiar with and for years had owned stocks and bonds and real estate; she was also familiar, as the auditor found, with the various records, accounts and tax returns relative to her property. It is contrary to reason and common sense to contend that Mrs. Conlin did not know the difference between (1) money; (2) bonds; (3) stocks; and (4) real estate. *Money in its ordinary customary and usual meaning* does not mean stocks; it does not mean bonds; it does not mean real estate; it means cash, wherever found, including that on deposit in banks.

In *Ingham's Estate,* 315 Pa. 293, 172 A. 662, the Court said (pages 295, 296) : ". . . under our cases the word 'money', when used in a will, is to be construed in the broad sense of wealth or property, instead of in its narrow sense as cash, *only where the context of the will and the circumstances surrounding its execution* require that it be so interpreted *in order to give effect to the testator's intention*: Jacobs's Est., 140 Pa. 268; Levy's Est., 161 Pa. 189; Dodson's Est., 253 Pa. 344; Ostrom v. Datz, 274 Pa. 375; Talbot v. Anderson, 292 Pa. 454; Williamson's Est., 302 Pa. 462; see Arnold's Est., 240 Pa. 261." See to the same effect: *Dickson v. Commonwealth Trust Co.,* 361 Pa. 612, 616, 65 A. 2d 408.

In *Levy's Estate*, 161 Pa., supra, testatrix left surviving her one son and three daughters. She left each of her daughters certain specific bequests of household effects and furniture, and then said: "Any sum of money I may have by me to be equally divided between my three daughters." There was no other provision in the will as to the residue or balance of her estate. Her estate amounted to $160,000., of which money was only a very small amount. The Court held that "money" did not include anything except "money", and that testatrix died intestate as to virtually her entire estate of $160,000. Judge PENROSE, in his adjudication, which was affirmed by this Court, said (page 194) : " 'There are undoubtedly cases where, under wills declaring or manifestly indicating an intention to dispose of the entire estate of the testator, a gift of "money" will pass his personal property generally. . . . These cases, however, are exceptional; and the general rule as stated in Williams on Executors (Perkins' edition, 1877), page 1286, is that "the word 'money' does not extend beyond what is literally 'money', unless the context requires it." ' "

If we interpret money in accordance with its ordinary and usual meaning, testatrix left $1,000. to Trinity Lutheran Church; her money, i.e., $6,246.—5/8ths to five of her husband's six nearest relatives (excluding one of his brothers) and 3/8ths to the children of her first cousin, Louis Weinmann. She further provided that if any one of the eight were dead, it should not go to his or her next of kin. *This is clearly and undoubtedly what testatrix said and is the exact meaning of her words,* and her intention, as thus clearly expressed, must prevail!

The testatrix's language being clear, resort to technical rules of construction is unnecessary. However, if rules of construction are considered, they do not

aid the appellees. The only possible way the language of the testatrix "share equally in money" *can be distorted* to mean that she made a gift to her three *distantly* related cousins and to five of her husband's relatives of an equal share of all her property would be to (1) change "money" to "property" and add the following *additional words,* viz., "which is not hereinbefore or hereinafter bequeathed"; and (2) hold *that this was a residuary clause;* and (3) that the word "money" did not mean money—it meant money and stocks and bonds and real estate. The language used by testatrix, a highly intelligent woman, as well as the scheme of *subsequent* gifts in her will, make clear— without resort to any rules of construction, even though such rules confirm—that such a construction of the will is impossible.

Testatrix's bequest of a "share in money" was not and *did not even purport to be a residuary gift, nor was it contained in a residuary clause or paragraph of her will.* Testatrix having given each of her named relatives and her husband's named relatives 1/8th of her "money", *followed* these gifts by thereafter giving her jewelry to her cousin, Mary Graham, her personal effects to her cousin, Lois Spangler, and her linen, bedding, dishes, silver, rugs and furniture to her cousin, Woodrow Weinmann. If Mrs. Conlin had wanted this gift of a share in money to be a gift of all her residuary estate, she knew how to so provide—not only because she was a teacher, a college graduate, a highly intelligent woman with business experience, an owner of stocks and bonds and real estate, but also because she knew what a residuary clause was, having executed on June 19, 1942, a will which contained the usual residuary clause giving "All the rest, residue and remainder of my estate" to her husband.

We cannot ignore or distort or add to the testatrix's language, as appellees would have us do, in order to avoid an intestacy. Certainly we should not do so when by doing so we would be disinheriting all of testatrix's closest heirs* in favor of strangers to her blood and more distant cousins. In *Beisgen Estate*, 387 Pa., supra, the Court, quoting from *Rouse Estate*, 369 Pa. 568, 572, 87 A. 2d 281, said:

" 'First considering whether there was an intentional [or accidental] omission, resulting in intestacy, there is a presumption testator intends to dispose of his whole estate. Such presumption, however, is met by an equally potent presumption that an heir is not to be disinterested except by plain words or necessary implication. The effect of the conflict of rules is well stated by Judge HUNTER in his Pennsylvania Orphans' Court Commonplace Book, Vol. 2, Wills, sec. 4 (b) p. 1436, in the following language: "These presumptions are of like force and effect, and in applying one we must not overlook the other. *Neither presumption however, can be permitted to defeat the intention of the testator which is expressed in apt words or appears by clear implication.*" See Grothe's Estate, 229 Pa. 186, 78 A. 88; French's Estate, 292 Pa. 37, 140 A. 549; Loving Estate, 159 Pa. Superior Ct. 339, 48 A. 2d 39. . . .

" '. . . If there were an omission, such omission might not be remedied by judicial construction. In Grothe's Estate, supra, Justice MESTREZAT said, p. 192: ". . . if it was an oversight, the courts have no author-

---

* Intestate Act of 1947, §1.3(5) ; *Ingham's Estate*, 315 Pa., supra; also, *Garrett Estate*, 371 Pa. 284, 289, 89 A. 2d 531; *Miles's Estate*, 272 Pa. 329, 116 A. 300; *Bell's Estate*, 31 D. & C. 670; Hunter, Pennsylvania Orphans' Court Commonplace Book, Vol. 1, page 674.

ity to insert a provision . . . . *If* he sees fit for any reason not to dispose of any part of his estate, or *such is the result of* ignorance or *oversight, the courts cannot supply the gap or hiatus and reconstruct the will.* To do so would be a perversion of the functions of the court, and deprive a testator of the right to dispose of his property." See: Morrison Will, 361 Pa. 419, 65 A. 2d 384, and cases therein cited.' *Furthermore, the presumption against an intestacy,* even where there is no countervailing presumption, *cannot be used to ignore or distort or alter testator's language in order to avoid an intestacy.* It merely means that if the testator's language is reasonably susceptible of two constructions, one of which will produce and the other avoid an intestacy, the latter interpretation or construction will be adopted unless it defeats the testator's intention: Ingham's Estate, 315 Pa. 293, 296, 172 A. 662."

In *Verner Estate,* 358 Pa. 280, 284, 56 A. 2d 667, the Court, quoting from *DeSilver's Estate,* 142 Pa. 74, 75, 76, 21 A. 882, 883, said: " 'The rights conferred by the intestate laws are only taken away by a will which effectually disposes of the entire estate of the decedent; and, while a construction is not to be adopted if it can be avoided, which will lead to an intestacy, interpretation is never to assume the proportions of reformation. The question is confined to the meaning of what the testator has said, and does not extend to the consideration of what he might have said but did not.' "

Appellants have cited cases in which the word "money" was interpreted in its usual and ordinary sense to mean ready cash; while appellees have cited other cases where "money" was given a broader meaning to include all of the testator's property, (1) because the gift of the rest or remainder or balance of

"my money" was contained in a residuary clause*; or (2) because of other language in the will which showed that it was used and intended in its broader meaning. Examples of this latter exception are found in the two cases cited by appellees: *Talbot v. Anderson*, 292 Pa. 454, 141 A. 256 and *Ingham's Estate*, 315 Pa.

---

* In *Estate of Jacobs*, 140 Pa. 268, 21 A. 318, after various pecuniary and specific bequests, testatrix provided: "The remainder and residue of my money I give, etc."

In *Bricker's Estate*, 335 Pa. 300, 6 A. 2d 905, testator directed that after his debts and funeral expenses had been paid, all real estate except his home was to be sold and "the proceeds from the sale of property with all other moneys or stocks shall be invested by my executor," and the income paid to testator's wife for her life and upon the death of the wife various sums of money were given to certain named persons and "The balance, if any, to be divided into ten equal parts between" ten named persons. The residuary clause further provided that on the death of the wife the home was to be sold by his executor and the proceeds divided among three named charities.

*Newhard v. Newhard*, 303 Pa. 299, 154 A. 500, involved the interpretation of a statute dividing between divorced spouses properties held by the entireties—under the language of that statute the decision was undoubtedly correct, but is entirely inapposite. A similar distinction applies to the meaning of the Retirement Fund under the Act of 1923 as correctly interpreted in *Commonwealth of Pennsylvania v. Dauphin County*, 335 Pa. 177, 6 A. 2d 870.

*Ostrom v. Datz*, 274 Pa., supra, is likewise clearly distinguishable. In that case testator devised a certain piece of real estate to his wife and after making a number of specific bequests, provided: "And as to the remainder of my money which shall remain after the payment of my debts and funeral expenses, and the aforesaid specific and pecuniary legacies, I give to the Home Missionary Society . . . ." The widow elected to take against the will and the Court held that "the result of the widow's election . . . was to give the disappointed residuary legatees a substitutionary interest in the property in question for the legacies as to which they were disappointed, and that, under the terms of the will, the word 'money' comprehended this real estate; . . . ."

293, 296, 172 A. 662. Neither case supports the construction contended for by appellees.

In *Talbot v. Anderson*, 292 Pa., supra, testatrix left an estate of $78,000., consisting of $3,700. in cash and the balance in stocks, bonds, mortgages, household goods, jewelry and real estate. She made bequests of pecuniary legacies totaling $40,000. which were to be paid "from the proceeds of my estate". She likewise directed that a $2,000. legacy "be made part of my general estate". She created a trust of personal property and provided that from the trust funds "interest and profits" and "rentals and profits" should be paid to a life tenant. She then provided: *"If there is any money left after everything is paid from my estate I would like it to be given to"* the plaintiffs. The Court wisely said that the $3,700. cash was utterly insufficient to pay the legacies of $40,000. and throughout her will testatrix, by her language, had clearly directed that no distinction was made between personalty and realty and that from a reading of the will as a whole she meant to dispose of her entire estate in her aforesaid residuary clause.

*Ingham's Estate*, 315 Pa., supra, strangely relied upon by appellees, is an example of the general rule enunciated in our opinion, as well as the exception hereinabove referred to where other language of the will demonstrates an intention to use "money" in its broader sense. Testatrix gave pecuniary legacies totaling $7,000. and then provided: "What is left of my money after my debts are paid I wish given to The Baptist Home". At the time of execution of the will, as well as at her death, the cash, which amounted to $2,200., was insufficient to pay the pecuniary legacies. Testatrix also left stocks and bonds appraised at approximately $24,000. The Court said: *"Testimony was produced* at the audit of the executrix's account *to*

*show that the testatrix always used the words 'my money' to refer to her own property, . . . ."* For these two reasons, as well as because of the residuary clause, this Court correctly held that the testatrix employed the word "money" in its wider sense and said, inter alia : ". . . under our cases the word 'money', when used in a will, is to be construed in the broad sense of wealth or property, instead of in its narrow sense as cash, only where the context of the will and the circumstances surrounding its execution require that it be so interpreted in order to give effect to the testator's intention . . . . Such a [residuary] clause must be construed as passing all that the testatrix possessed, whether she was aware that she owned it or not. Indeed, one purpose of a general residuary clause is to dispose of such things as may have been forgotten or overlooked, or may be unknown : Ireland v. Foust, 56 N.C. 498 . . . 'A general residuary devise carries every real interest, whether known or unknown, immediate or remote, unless it is manifestly excluded . . .' " *Ingham's Estate,* upon which appellees rely, supports, we repeat, our construction of Mrs. Conlin's will instead of the appellees'.

Finally, appellees and the Court below attach considerable weight to the fact that Louis Weinmann did not join the other heirs, namely, his sisters, in their claim that the word "money" meant money instead of money and stocks and bonds and real estate. Although that would not be a legal reason for ignoring or distorting the language of Mrs. Conlin's will, his position is not difficult to understand. A father has a natural disinclination to oppose in a Court action his own children, especially where, (a) if successful, he would receive approximately $23,000., and (b) if unsuccessful, his children would receive approximately $36,000.

In our opinion the testatrix's gift of a "share equally in [her] money" *followed by other gifts or legacies, but with no residuary clause,* was a gift only of money—that is, cash and bank accounts, and we cannot distort the testatrix's language and disinherit her heirs in order to avoid an intestacy.

Order or Decree reversed at cost of appellees; case remanded to lower Court to order and approve a schedule of distribution in accordance with this opinion.