Pickering Estate

*Hale Pratt* and *I. J. and D. W. Van Artsdalen*, for accountant.

*Harriet M. Mims*, guardian ad litem for Brian Joseph Lockhart and Mary Caroline Lockhart, minors, and trustee ad litem for unborn or unascertained persons.

*Charles J. Biddle, Philip Wallis, Samuel S. Gray, Jr., John Bishop, 4th, Arthur E. Newbold, 3d, William J. Begley, Frederick E. Smith, Francis M. Richards, Jr.,* and *William Carson Bodine*, for claimants.

SATTERTHWAITE, J., February 21, 1958.—The construction of certain clauses of decedent's will raises the problems presently before the court. The executor having filed a partial account, the court appointed an auditor to construe the testamentary language. To his report, exceptions were filed and argued before the court en banc. These exceptions raise two fundamental problems: (1) Who are the beneficiaries of subparagraph (b) of the eighth item of the will; and (2) what is the effect of the tax clause of the first item of the will insofar as it concerns the payment of Pennsylvania transfer inheritance tax on a life estate therein created?

Testator died on December 7, 1955, at the age of 93 years, leaving an estate appraised in excess of $8,000,000. He had executed his will on August 7, 1953. After directing the payment of debts and taxes, bequeathing certain pecuniary legacies to charities

and devising certain real estate, and, incidentally, disposing of only a small fraction of his estate, testator then made the provisions which are the immediate subject before the court, as follows:

"Item 8—After payment of all my just debts, taxes and cost of the administration of my estate and the specific legacies, all the rest, residue and remainder of my estate both real and personal and wheresoever situate and not hereinbefore bequeathed, I give, devise and bequeath to my Trustees hereinafter named IN TRUST NEVERTHELESS for the following uses and purposes;

"(a) . . . [as to three-quarters thereof to pay the net income to his niece, Anna Winifred Beatrix Lockhart, for life, and upon her death to distribute principal to her child or children, the 'issue' thereof to take if any deceased, and in default of children or their issue, then to 'my heirs'] . . .

"(b) to pay over and distribute the other one quarter of the aforesaid remainder of my estate as soon as it can conveniently be done, to the children of my aunts Hannah Barnsley Chambers and Elizabeth J. Comfort and to the children of my uncles William Barnsley and J. Herman Barnsley, share and share alike; and in case any of such children are not living at the time of my death then their share to go to their children."

He had made a prior will in 1940 which contained a residuary clause not only setting forth the same plan of distribution, but in fact using the literally identical language.

Testator was a bachelor who had lived in Newtown for over 50 years, residing alone since the death of his mother in 1908. He had no brothers, and his only sister, a Mrs. Spong, had died some years before him. The latter's only child, his niece Mrs. Lockhart, was his closest blood relative. For many years she has lived

in Ireland. The record is not clear as to whether he had relatives on his father's side. In any event they were not closer than cousins, and he chose to disregard them entirely. He did, however, desire to leave a portion of his estate to be distributed among those to whom he was related through his mother. The latter originally had six sisters and brothers, all of whom were deceased even before 1940 when he had made the earlier will. Two of the aunts died in 1904 and 1923 respectively, without issue. They are not referred to in either will. The stipulated necrology and lineage of the two aunts and two uncles to whom testator did make reference by name in identical fashion under the residuary clauses of both wills are as follows:

1. Hannah Barnsley Chambers died in 1924 leaving eight children her surviving, five of whom, however, died before testator and without issue. One child, Elizabeth C. Chambers, still survives. Another child, Helen T. Chambers Roberts, died in 1947, leaving three sons who survive. A third child, Fanny W. (Hopkins) LeRoy, died in 1951, having had but one child, Robert Emmet Hopkins, who died in 1946 leaving two sons who survive.

2. Elizabeth J. Comfort died in 1932 having had but one child, Emma W. C. Crookshank, who died in 1954, leaving a son, Harry F. C. Crookshank, who is still living.

3. William Barnsley died in 1902, a son having predeceased him in 1898 without issue. He was survived, however, by one daughter, Lydia H. B. Hicks, who died in 1927 leaving a daughter, Mary E. B. Richardson, who is still living.

4. J. Herman Barnsley died in 1932, leaving a son, Edward R. Barnsley, who still survives. He also had another son who died in 1925 without issue.

The first problem presently before the court is the determination of which of these descendants of aunts

and uncles should take. On behalf of Edward R. Barnsley, it is contended that the gift of item 8(b) was to a class of children of aunts and uncles, that to be an eligible member of the class so that representation under the "substitutionary" clause would be effective, such child must have been living in 1953 at the date of the last will, that descendants of a child who was not then living are excluded and that therefore the fund should be awarded one-third to Elizabeth C. Chambers, one-third to Harry F. C. Crookshank in the right of his mother who died in 1954, and one-third to himself. On behalf of the Roberts brothers and Mrs. Richardson, however, it is argued that the fund should be divided five ways so as to include them under the alternative language of the final clause above quoted, notwithstanding that their respective parents were deceased prior to 1953. On behalf of the Hopkins family, the same argument is made, supplemented by the further contention that the alternative clause should be construed so as to include grandchildren of children of the named uncles and aunts with a resulting division of the fund into six shares.

The learned auditor concluded that the fund should be divided into five equal parts, one for Elizabeth C. Chambers, one to be divided equally among the three sons of Helen T. Chambers Roberts, one for Harry F. C. Crookshank, one for Mary E. B. Richardson and one for Edward R. Barnsley. He further decided that the Hopkins, being grandchildren and not children, of a deceased child of a named aunt of testator, were not entitled to participate. Exceptions to these results were filed on behalf of Mr. Barnsley, on the one hand, and by the Hopkins brothers, on the other. Miss Chambers and Mr. Crookshank apparently have acquiesced in the auditor's division, adopting a neutral position at the argument.

The basic difficulty in the position adopted on behalf of Mr. Barnsley arises out of its fundamental assumption that since item 8(b) provides for a gift to a class, therefore, the last clause thereof necessarily must be merely substitutionary in nature. Such an approach, while superficially appealing in logic, not only would tend to obscure the real problem, but also would be likely, by the application of a fortiori reasoning, to prejudge the ultimate solution of the actual merits without permitting resort to what testator may in fact have intended. We have no quarrel with counsel's definition of a class gift, nor with the proposition that the first clause of item 8(b), if standing alone, would create that type of disposition. To isolate the first clause from the alternative provision of the later clause, however, would seem to found the decision of the case on an unwarranted premise that inevitably by its own force alone must predetermine the ultimate result without regard to the merits, if carried to its logical conclusion. We cannot dispose of the case on such an arbitrary basis.

If item 8(b) must be characterized from the class point of view, we would prefer to define it as a gift to *two* interdependent but mutually exclusive classes, designed to carry out testator's obvious intention to provide for various lines of the family: The first, on a per capita basis, for the benefit of all cousins who survive to represent personally their respective branches; and the second, on a per stirpes basis, for the benefit of the family lines of cousins who in fact may themselves have died before testator but who left children surviving to continue the existence of their respective geneological branches into the next generation.

Such an analysis of the situation does not inexorably predispose of the ultimate issue; to the contrary, it points up the real matter for determination, which has

been succinctly stated in McCarty's Estate, 138 Pa. Superior Ct. 415, 417-418, to be as follows:

"The question is whether appellants, children of a deceased member of the class who died prior to the making of the will, are entitled to take the share which their parent would have taken if living at the date of the will, by virtue of the provision for the children of a deceased child to take their parent's share. *The answer depends upon whether such provision constitutes a substitutional, or an original and substantive, gift.*" (Italics supplied.)

This approach would also tend toward clarity in the proper consideration of the many precedents which are urged both for and against the auditor's conclusions.

Much has been said, both in the auditor's report and in the arguments and briefs presented to us, concerning the so-called rule of construction laid down in the English case of Christopherson v. Naylor, 1 Mer. 321, 35 Eng. Rep. 693 (Ch. 1816), which, as we understand it, might shortly be stated to be that where there is a gift to a class with a gift over in the event of the death of a member of the class in favor of one representing his right, such representative's interest, being substitutionary in nature, cannot rise higher than that of his ancestor, and that he therefore cannot take if the ancestor, although within the generic class description, had died before the will was written, since it should be presumed that testator did not intend to give an interest to one then already deceased. We need not decide, however, whether the Christopherson case represents the law of Pennsylvania. Even if it does, it and the several decisions which at first glance might seem to follow it are readily distinguishable, either on the ground that testator's expressed intent dictated the appropriate result apart from the rule, or on the basis that there was a true gift to a single class with

strictly substitutionary or derivative interests over or without any further express limitations whatsoever.

Thus, in Barbara Herr's Estate, 28 Pa. 467, although the outcome was the same as though the Christopherson rule had been applied, the real basis for the decision excluding claimant as the representative of a member of the class who was deceased when the will was written lay in the fact that other testamentary provisions, including independent and separate beneficial dispositions in claimant's favor, specifically stated to be his share "in full", expressly indicated that result to have been testator's intention. Harrison's Estate, 18 Pa. Superior Ct. 588, affirmed in 202 Pa. 331, and Kessler's Estate, 288 Pa. 91, were decided, in part at least, on the same basis. Likewise, in Estate of William Morrison, 139 Pa. 306, when testator described the class, he expressly referred to "living" members thereof and phrased the gift over in terms of the future; parties claiming under the latter provision were held clearly to be outside those intended by testator because of the language used, their ancestor having died before the date of the will. See also Hough v. Hough, 4 Rawle 363.

So, too, there are cases in which testator made a class gift but which are distinguishable from the instant case in that there was no express provision whatsoever for the event of the death of one of the class. The question thus presented was whether or not children of a deceased member might take the deceased party's share by substitution of law under the antilapse statutes. Prior to the Act of July 12, 1897, P. L. 256, now replaced by section 14(8) of the Wills Act of April 24, 1947, P. L. 89, 20 PS §180.14, it had been held that the earlier legislation on this subject did not preserve a gift in favor of a member of a class who did not survive testator; even though he died after the will was written, his issue would not be substituted:

Gross' Estate, 10 Pa. 360. Although the Act of 1897 purported to change the law in this respect by including class gifts in the anti-lapse category, nevertheless the appellate courts still followed the rationale of the Gross case insofar as it had not been expressly modified by the legislature, and held that the Act of 1897 would not preserve for issue the interest of one otherwise meeting the class description, but who was deceased when the will was written; the reasoning was that the ancestor never having been within the class in fact, his issue could not acquire higher rights by substitution: Harrison's Estate, supra; Todd's Estate, 33 Pa. Superior Ct. 117; Worstall's Estate, 125 Pa. Superior Ct. 133.

Along this same line there are still other cases where the testamentary provisions, like the anti-lapse legislation, were construed to be strictly substitutional in nature, and to create no direct or original interest in the successor party in his own right: McCarty's Estate, supra; Weber Estate, 155 Pa. Superior Ct. 403. If that be the proper interpretation of a testator's intention, of course, it would seem to follow, just as in the cases arising under the statute, that if the ancestor never was a member of the class in fact, his representative could not take more than the one in whose place he stands. In neither McCarty's Estate, where the first takers were simply "my chidren", nor Weber Estate, where they were "my brothers and sisters" was there any indication of intent to include representation of specific family lines of primary or first-named beneficiaries who may have been deceased when the will was written. In the instant case, however, we believe such intention is apparent, as hereinafter demonstrated.

On the other side of the picture, there are also cases in which the Christopherson rule could have been applied, but because of testamentary intention to the

contrary it was not, and, in fact, entirely different re-
sults were reached. Thus, in Long v. Labor, 8 Pa. 229,
the court found that the testamentary purpose of equal-
ity of treatment of all branches of the family was
sufficiently expressed to permit issue to take the share
of one of the general and unparticularized class of
testator's children who was deceased at the date of the
will. See also Sorver v. Berndt, 10 Pa. 213; Martin Den-
linger's Estate, 170 Pa. 104; Golden's Estate, 320 Pa.
4; Lentz Estate, 167 Pa. Superior Ct. 377.

It is hornbook law that the intention of testator, if
not unlawful, is the pole star and must prevail in the
interpretation of every will, and that such interpreta-
tion must be ascertained from a consideration of the
entire will, including its scheme of distribution as well
as its language, together with all the surrounding and
attendant circumstances: Lifter Estate, 377 Pa. 227,
231; Cannistra Estate, 384 Pa. 605, 607; Cryder v.
Garrison, 387 Pa. 571, 576; Conlin Estate, 388 Pa.
483, 486.

Under these principles and after due consideration
of the background of the family situation against
which testator wrote his will in 1953, as above out-
lined, coupled with a consideration of the whole testa-
mentary scheme in itself, we believe that the auditor
arrived at the correct disposition of the case. Testator's
expressed intention, as ascertained from the four cor-
ners of the will considered in light of such surrounding
circumstances, inescapably compels the conclusion that
those descendants of the named aunts and uncles
should take, within the limit stated, not by way of sub-
stitution but in their own original right, whether or
not their respective parents were alive at the time the
1953 will was made. In considering his provision for
those to whom he was related through his mother, we
believe that he adopted a scheme whereby he intended
that all of the various branches of the family, orig-

inally delineated by cousins and still in existence, should be treated with equality and with neither preference nor discrimination among them, whether based on the fortuitous circumstance of death of the progenitor before or after the date of the will, or otherwise. He drew the line of participation, however, within the respective branches, at the next generation in the case of any cousins who should happen to predecease him.

We believe that such a result is the natural and logical meaning of the very language that he used in item 8(b) of his will. He expressed no contingency of time therein for the operation of the alternative clause providing for the participation of children of cousins, other than that of his own death. He did not limit his designation of the respective lines of the family by restricting them to cousins "now living" or by the use of other words of similar import; to the contrary, in contemplating the death of cousins, he referred to "*any* of such children" without further qualification. Why, therefore, should we insert additional contingencies which testator did not see fit to express? Why should we not carry out the plain and ordinary meaning of the words he did use by interpreting the same as would any layman not influenced by legalistic and artificial rules of construction?

Moreover, any possible doubt which might arise from the mere phraseology of the will alone is completely dispelled when it be considered against the above outlined family situation, as to which there is affirmative and uncontradicted proof that he had definite knowledge insofar as it is presently material. In this connection it is important to note that he referred to children of named aunts and uncles, not to cousins generically. While he might have phrased his will in this fashion merely to insure that the beneficiaries should not include cousins on his father's side, if any he had, it is plain that such was not his sole reason.

To the contrary, his specification of particular members of the family by express reference to the names of their respective ancestors becomes highly significant when we recall the identity of those whom he did, and did not, so mention. He entirely omitted any reference to the two aunts who had died some years before without children or grandchildren. There would have been no point in his mentioning them since their lines had become totally extinct. However, he did name his uncle, William Barnsley, in identifying one branch of the family. We cannot assume that he did so with no purpose. Accordingly, it is reasonable to suppose that he must thereby have intended to benefit that branch, and this despite the fact that in 1927, before either will was written, he had been a pallbearer at the funeral of Lydia H. B. Hicks, his only cousin, past or present, who had survived the named ancestor in this geneological line. It seems obvious that he referred to this uncle by name for a purposeful and yet convenient mode of description of an intended line of beneficial enjoyment, and that Mrs. Richardson, being within the further limitation of a child of a deceased cousin in this line, was thereby intended to participate notwithstanding the prior death of her mother. Consistently, the same interpretation of the word "children" must be applied uniformly throughout item 8(b) and be similarly construed with respect to the other branches of the family so as to permit the children of Helen T. Chambers Roberts likewise to take.

Still further, notwithstanding that the evidence discloses that he was fully cognizant of the death of his cousin Helen T. Chambers Roberts in 1947, he having attended her funeral, and notwithstanding that he must therefore have known that her sons would take her proportion of his residuary estate under the 1940 will if he left it in effect, nevertheless, he subsequently made the 1953 will which, although providing for

additional specific bequests, made no change in his testamentary scheme for the bulk of his estate, and still contained exactly the same residuary clause. By using the identical phraseology in 1953 which he had adopted in 1940, and there being other obvious reasons for writing the new will, he cannot reasonably be understood to have meant such language to have any different effect in the later document than in the earlier one. Compare Blair Estate, 71 Pitts. L. J. 662, 665-666. The evidence discloses no indication whatsoever that he would have been inclined to favor Harry F. C. Crookshank, who for years had lived in England, as a potential distributee of a share of his estate in the right of his mother, a contingency which in fact became an actuality under any construction of the will, while at the same time presently and definitively excluding the Roberts brothers who lived in Princeton, N. J., and Washington, D. C., and who stood in the same degree of family relationship to him. To the contrary the will as a whole, whether dealing with members of testator's mother's family under item 8(b), or the purely local charitable legatees named in item 2, indicates that his design was that of equality of participation within particular categories of beneficiaries. We therefore believe that he intended no distinction among them based on the purely arbitrary time of death of their respective ancestors. Accordingly the exceptions filed on behalf of Mr. Barnsley to the ultimate conclusions of the auditor should be overruled.

On his behalf it is further objected, however, that the learned auditor improperly received certain matters of evidence. Six of the exceptions filed for him raised questions of this nature. The first, second, fifth and sixth of these require little discussion. We need not pass thereon for the reason that whether or not the auditor correctly ruled in connection with the specific subjects therein mentioned is of no present

practical importance since none of the items of evidence so challenged have been considered by us in any degree in determining the merits of the case. We do not understand that at the auditor's hearing counsel raised objection to any of the matters of fact upon which we have relied and to which reference has already been made herein, with the one exception of the 1940 will. The family geneology, including dates of death, was introduced by stipulation. Miss Chambers' testimony, insofar as it concerned testator's knowledge of the death of various members of the family and his attendance specifically at the funerals of Mrs. Hicks and Mrs. Roberts, not only was unchallenged and unimpeached, but in fact supplied a factor the absence of which was expressly considered and commented upon in Worstall's Estate, 125 Pa. Superior Ct. 133, 140. Compare Lentz Estate, 167 Pa. Superior Ct. 377, 379, where testator's knowledge of such matters was likewise referred to.

We do not agree that Yates' Estate, 281 Pa. 178, is an authority precluding such considerations. That case merely holds that a testator's knowledge that a childless named beneficiary was too old to bear children, and that she had adopted a child, would not justify the conclusion that he intended the word "child", as used in one of several parallel and identical clauses benefiting the various lines of the family, to include "adopted child"; there, extrinsic circumstances were relied upon to change or enlarge the very subject matter of those described as beneficiaries. In the present case, however, neither we nor the auditor have attempted to extend the word "children" beyond those literally within that concept; the sole problem here is the determination of which children are to be included. Consideration of unequivocal evidence of testator's knowledge of the family situation certainly is not improper under the latter circumstances; such

matters definitely are part of the surrounding circumstances under which the will was written and in the atmosphere of which it is necessary for us to place ourselves in construing testator's expressed intention.

The third and fourth Barnsley exceptions dispute the right to receive or give any consideration to testator's earlier will executed in 1940, not because the proof thereof was in any sense improper, but solely on the ground of relevancy and competency. We do not believe that the auditor erred in this respect. Under the particular factual situation here arising it certainly was relevant, and, as another of the surrounding circumstances attendant upon the execution of the 1953 will, it was competent under the authorities already mentioned. Moreover, there is specific precedent therefor: Hirst's Appeal, 92 Pa. 491; Conlin Estate, 388 Pa. 483, 491; Williamson Estate, 161 Pa. Superior Ct. 106, 110; Blair Estate, 71 Pitts. L.J. 662. These exceptions, therefore, should also be overruled.

Turning to the arguments on behalf of the Hopkins, we again feel that the auditor reached the only proper solution. Their construction of the alternative clause of item 8(b) cannot be sustained. The exact language is: "... and in case any of such *children* are not living at the time of my death then their share go to their *children*." (Italics supplied.)

In order to justify participation by the Hopkins, counsel contend that, although the word "children" as first used must literally mean "children" in order to define the family lines and respective proportions into which the fund should be divided, nevertheless, the word "children" as used the second time would not be restricted to its literal sense and might be considered as including "grandchildren". They attempt to sustain this position by arguing that evidence of testator's family situation and contemporaneous declarations of regard for all branches thereof permit the

inference of his intention to reach the next generation as objects of his bounty.

This position flies in the face of all the precedents. It is well settled that where the word "children" is used and, in fact as in this case, there are children who may take, grandchildren do not participate unless the intention to produce that result is apparent in the language of the testator: Todd's Estate, 33 Pa. Superior Ct. 117, 121, and cases cited; Worstall's Estate, 125 Pa. Superior Ct. 133, 139-140, and cases cited; McCarty's Estate, 138 Pa. Superior Ct. 415, 417. See also Harrison's Estate, 18 Pa. Superior Ct. 588, 591, affirmed in 202 Pa. 331, 333-334; Moyer Estate, 389 Pa. 228, 235-236. This principle controls the present aspect of these proceedings.

Moreover, we cannot conjecture as to what we or anyone else might believe testator may or should have meant; to the contrary, our only province in construing testamentary language is to determine the meaning of the words actually used: Burpee Estate, 367 Pa. 329, 336; Beisgen Estate, 387 Pa. 425, 430-431; Conlin Estate, 388 Pa. 483, 488. The position of the Hopkins brothers in this respect comes squarely within the interdiction of Yate's Estate, supra. Here, by way of contrast to the situation arising from the claims of Mrs. Richardson and the Roberts family, the attempt is being made to alter and extend the lexicographic concept of the word "children" by enlarging and advancing upon the category of beneficiaries so unambiguously stated, rather than merely explaining or restricting the applicability thereof among those who are literally within the designation.

Still further, testator's intention to use the word "children" in the literal sense in the present connection is especially apparent by way of contrast to his reference to "issue" in the earlier provisions of item 8(a) when disposing of the ultimate remainders after the

death of Mrs. Lockhart in the event of the death of any of her children. Had he intended participation in item 8(b) beyond the second generation, his own language demonstrates that he knew how to accomplish that result; his failure to use such a broad designation, therefore, most certainly may not be disregarded or considered to be without significance.

We now turn to the second set of exceptions to the report of the auditor, those concerned with the impact of the Pennsylvania transfer inheritance tax. Do the provisions of the will give a life interest in three-quarters of the residuary estate to Mrs. Lockhart free of such taxes? Does the executor have the right or duty to pay the tax on the remainder interest in such three-quarters prior to the death of the life tenant? Should all of the tax payments be made before dividing the residuary estate into the respective three-quarters and one-quarter shares contemplated by the will? The learned auditor answered all three questions in the affirmative. Exceptions thereto were filed by the guardian and trustee ad litem appointed to represent minor and unascertained interests in remainder. Exceptions to the affirmative answer to the second and third questions were also filed by the life tenant, but were later withdrawn, and counsel now advise that the tax on the remainder interest may be paid prior to her death so far as she is concerned notwithstanding that her income would thereby be diminished.

It is well settled, of course, that as a general rule inheritance tax exactions are ultimately payable, absent a testamentary direction to the contrary, by the respective beneficiaries, either directly or by deduction from the estate passing to them: Spangenberg Estate, 359 Pa. 353, 355, and cases cited. It is equally true that under section 3 of the Transfer Inheritance Tax Act of June 20, 1919, P. L. 521, as amended, 72 PS §2304, the tax due on a future interest normally is not pay-

able, so far as the taxing authorities are concerned, until such estate comes into possession and that therefore the personal representative ordinarily would be unauthorized in paying the same prior to that time: Constable's Estate, 299 Pa. 509, 514. The real question in the present case, therefore, is whether or not testator sufficiently expressed his intention that these general rules should not apply and that another scheme should be substituted therefor.

By the first paragraph of the will, he provided as follows:

"Item 1. I direct that my *Executor* pay all my just debts and funeral expenses as soon as possible after my decease; and that the same together with *all* Transfer Inheritance Taxes, Federal Estate Taxes and other taxes *be paid from my residuary estate,* and that *no part* of said Transfer Inheritance Taxes or Federal Estate Taxes be taken or deducted from the specific legacies or the *legacies giving a proportionate part of my estate, as* hereinafter set forth." (Italics supplied.)

The introductory part of the eighth paragraph, the residuary clause, is as follows:

"Item 8—*After* payment of all my just debts, *taxes* and cost of the administration of my estate and the specific legacies, all the rest, residue and remainder of my estate both real and personal and wheresoever situate and not herein before bequeathed, I give, devise and bequeath to my Trustees hereinafter named IN TRUST NEVERTHELESS for the following uses and purposes:

"(a) *to hold* three quarters of *this remainder* as a Trust Fund for the benefit of my niece Anna Winifred Beatrix Lockhart . . . [for life with remainders to her child or children or issue and in default thereof to testator's heirs] . . .

" (b) *to pay over and distribute* the other one quarter *of the aforesaid remainder* of my estate *as soon as it can conveniently be done,* . . . [to the children of specified aunts and uncles or their children]. . . ." (Italics supplied.)

In view of this language and the testamentary scheme thereby indicated, we agree that the learned auditor reached the correct answer to all three of the questions posed above. The tax due by reason of Mrs. Lockhart's life estate must be paid out of principal of the general estate; the tax attributable to the remainder interest of her children not only may, but must, be computed and paid by the executor, likewise out of the general estate, before the actual residue for distribution purposes can be ascertained; necessarily, therefore, payment of all taxes must be provided for out of the whole residue before division thereof into the three-quarters and one-quarter shares.

In connection with these questions of tax liability, however, it must constantly be borne in mind that no appraisement or assessment of tax has yet been made by the Commonwealth, insofar as this record discloses, and it would therefore be not only premature but actually improper for us to express any opinion as to the correct choice of the various possible and alternative modes of determining the final dollar amounts of tax liabilities. Accordingly, we will not consider or discuss the tax computations based on the hypothetical figures contained in the auditor's report.

We believe it to be clear that testator intended all benefactions in his will, including not only the pecuniary and other particular bequests but also the various interests in the residue, to be ascertained only after all taxes of the estate or of the various beneficiaries thereof, whether present or future, had been paid and satisfied. In other words, we apprehend from the entire testamentary scheme that it was his purpose

that the dispositive provisions of his will should be effective only with respect to the net estate which remained after all tax liabilities had been discharged. In so deciding, we regard the following factors to be significant: That testator plainly intended that the *executor*, not the trustee or the legatees, pay such taxes; that he ordered payment not merely of those death taxes legally due and collectible currently and during the administration of his estate, but rather of *all* taxes; that his desire in this respect was amplified by his express direction that such taxes should not be deducted either from "specific legacies" or from "legacies giving a proportionate part of my estate"; that the residuary clause was expressly operative only "*After* payment of *all* . . . taxes . . ."; that the trustee was directed to hold three-quarters of "*this* remainder" only, ie., such amount as had been previously specified with particularity as that which was left after all debts, *taxes*, administration expenses and specific bequests had been satisfied; that distribution of the one-quarter share "of the *aforesaid* remainder", i.e., of the same net estate, was to be made outright and "as soon as it can conveniently be done."

That these expressions of intention are sufficient not only to indicate testator's desire that the life estate be exempt from tax but also to permit such purpose to be carried out by placing the tax attributable thereto upon the general corpus of the estate seems clear from decided cases. In a context justifying the conclusion that such was the intention, the word "legacy" may properly be construed to include a part of residue: Norris's Estate, (No. 3), 217 Pa. 560. In the present will, no interests of a proportionate nature are anywhere provided for other than those specified in the residuary clause. It seems almost beyond question, therefore, that Mrs. Lockhart's life estate was intended to be included in the tax-free category. It follows

that such intention should be given effect notwithstanding that the life estate is a part of the residue, or that testator did not in so many words direct taxes to be paid out of *principal*.

A case squarely in point is Spangenberg Estate, 359 Pa. 353, where the original will had made no provision for taxes, but a codicil thereto, after providing for additional specific bequests, further charged the "residuary estate" with "all taxes imposed upon my Estate, as well as ... (taxes on) ... any of the legacies hereinabove given". The Supreme Court held that inheritance tax on a life estate in the residue provided for in the will should be paid out of the principal of such residue, observing, at page 356, as follows:

". . . it was the clear intent of the testatrix that the legatees of all legacies, including that of appellant's life interest in the residuary estate, were to be relieved of the obligation of paying the transfer inheritance tax and that that burden was to be shifted to the corpus of the residuary estate."

Similarly, in Brown Estate, 72 D & C 399, the will contained a clause that all taxes chargable against "any of the bequests herein made shall be paid out of my residuary estate to the end that no bequest, whether pecuniary or specific, shall suffer any diminution whatever by reason of any such tax or taxes", and a codicil, after creating an annuity to be paid out of income of the residue, further directed the residuary estate to be charged with inheritance taxes which might be levied "against the above bequest or against any of the bequests in my said will or codicils". The Orphan's Court of Delaware County held that a life tenant of the residuary estate was not liable for inheritance tax on his interest, and his objections to the trustee's deduction of amounts from income on account of an alleged right of reimbursement therefor were sustained.

Cases relied upon by the guardian and trustee ad litem do not in the least militate against our conclusion that the life estate in the instant case should not be charged with the tax attributable thereto. All of these precedents recognize that the real question is one of intention. In Brown's Estate, 208 Pa. 161, hereinafter discussed in another connection, the real problem was whether inheritance taxes on various life estates were to be paid out of gross income before division, or should be deductible separately from income due each life tenant after division; the will expressed no intention to place such taxes on principal, and the court so held. In Uber's Estate, 330 Pa. 417, and Roberts' Estate, 2 D. & C. 541, neither the relative position of the tax-free clause within the will nor the language thereof would permit the inference that it was intended to apply to a life interest in the residue. Schoen Estate, 1 Fiduc. Rep. 113, is difficult to rationalize from either point of view insofar as the opinion depicts the facts of the case. As to one life estate in an allocated fund which in fact was part of the residue, the court held that the tax clause required death taxes to be paid out of principal; as to another, and by way of contrast for reasons which are not apparent, it held a different life tenant responsible for his own tax.

We also believe that the relevant portions of the within will already referred to likewise justify the further conclusion that taxes attributable to the remainder interests in the three-quarter portion of the residuary estate not only may, but should, be discharged by the executor before distribution. Testator directed that "all" taxes be paid by the executor, and further ordered that only "after" payment thereof would the dispositive provisions of the residuary clause be operative. In other words, the beneficial interests contemplated by the eighth item of the will cannot be limited, defined or set apart, either as to the one-

quarter or the three-quarter shares thereof, until the tax liability has been discharged in full. That such testamentary scheme is not properly capable of an interpretation which would permit postponement of payment of portions thereof would seem clear from testator's further direction that the one-quarter share of such net distribution be awarded "as soon as it can conveniently be done."

These expressions of intention, coupled with the other circumstances of the case, override the precedents relied upon by the guardian ad litem. Thus, in Uber's Estate, 330 Pa. 417, the testamentary language totally failed to evidence any intention that taxes be discharged before the respective shares of the residue be marked out; the tax-free clause related only to the specific legacies and a devise of particular real estate and had no implicit application to any interest in the residue as such, or to the computation of respective shares thereof. Moreover, the situation in that decision presented the further insoluble practical difficulty that differing rates of tax were applicable to the respective portions of the residue, a circumstance not present in the instant case; in fact, the rate attributable to the ultimate remainder of one of the shares in that case could not even be determined until a general testamentary power of appointment had been exercised upon the death of a life tenant thereof. See the opinion of the Orphans' Court of Philadelphia in this same case, 29 D. & C. 341. Compare, on the same question of practicalities, Marvin's Estate, 26 D. & C. 527.

Nevertheless, the Supreme Court expressly recognized in the Uber case, 330 Pa. at page 420, that "where . . . the residuary estate is to be divided . . ., the testator may direct that the tax on the entire residuary estate should be paid from it as a whole, instead of each of the participating beneficiaries paying the tax applicable to his own share," provided, of course, that

the language of the will be free from doubt on the subject. While there was doubt on this point on the cited case, we do not believe that such uncertainty exists in the instant case.

On the other hand, there are many decisions which hold that broad and all inclusive tax-free clauses such as we have before us justify the placing of tax liabilities upon the general estate and this to be done before determination of the distributive shares thereof. Thus, in Brown's Estate, 208 Pa. 161, already referred to, supra, although the court did not find any intention that taxes on life interests be paid out of principal, it did hold that the direction to divide income among the several life tenants, "after taking any and all necessary expenses" therefrom, compelled the payment of taxes out of general income before distribution rather than deducting the same from the respective shares of income due each beneficiary after division. Anderson's Estate, 312 Pa. 180, decided that a direction to pay "all . . . taxes of any kind", specifically mentioning those arising from a specified life estate, was sufficient to place inheritance taxes attributable to certain legacies upon the residuary estate notwithstanding that such legacies were not expressly referred to in the tax clause. Horn Estate, 351 Pa. 131, is to the same effect. Compare North's Estate, 50 D. & C. 703, and Audenried Estate, 84 D. & C. 468, affirmed in 376 Pa. 31, which were concerned with the analogous problem of determining the effect of all-inclusive tax clauses in prorating Federal estate taxes where exempt charitable beneficiaries were involved.

DeBorbon's Estate, 211 Pa. 623, is squarely in point. In that case testator directed his executor to pay all inheritance taxes "as soon after my decease as the same can conveniently be done." The Supreme Court held that the statutory provision that taxes on remainder interests "shall not be payable" until they come into

possession means merely that they shall not be "demandable" by the State; such language does not prohibit prepayment if that be the testamentary purpose. The court further decided that the executor did properly carry out testator's intention by immediately paying all taxes, under the wording of the will, including those attributable to the remainder after a life estate, pointing out that it is usually the life tenant who would be prejudiced by the prepayment, but that even she could not object in this case since her estate was given "cum onere." To this might be added that in the instant proceedings the life tenant not only legally cannot, but in fact does not, make any objection.

Thompson Estate, 86 D. & C. 584, relied upon by the guardian and trustee ad litem in this connection, does not detract from the authority of DeBorbon's Estate as a precedent in the within proceeding. In Thompson Estate the only testamentary indication relative to the time of payment of taxes, in the tax clause of the will or otherwise, was the specific inclusion of taxes on beneficial trust interests "up to the time of distribution by the Court on the audit of the *executors*' account." (Italics supplied.) The Orphans' Court of Allegheny County therefore quite properly held that the provisions of the will were not as all inclusive as those involved in DeBorbon's Estate, and that, in fact, by referring to the audit of the executors' account, the testamentary intent must have been to invoke the statutory scheme for the normal payment of taxes, as otherwise this reference would be meaningless. In the present case, however, the within testator's language, by directing outright distribution in part "as soon as it can conveniently be done" and specifying that such part be determined "after payment of all . . . taxes", amounts by indirection to compel exactly the same result as that reached in DeBorbon's Estate

where the substantially identical phrase appeared directly in the tax clause itself.

## Final Decree

And now, February 21, 1958, for the reasons stated in the foregoing opinion, the several and respective exceptions filed to the report of the auditor are all hereby dismissed, and the auditor's conclusions of law numbered 1 to 21, inclusive, and his schedule of distribution, as set forth in and appended to his report, are hereby confirmed, approved and adopted as the final judgment of this court, costs to be paid out of the principal of the estate.