Gibson *v.* McBurney, Appellant.

Argued March 17, 1960. Before JONES, C. J., MUSMANNO, JONES, COHEN, BOK and EAGEN, JJ.

*Gilbert E. Long,* with him *Michael Halliday,* for appellants.

*William J. Joyce,* with him *Martin E. Cusick,* and *Wiesen, Cusick, Madden, Joyce, Acker and McKay,* for appellees.

OPINION BY MR. JUSTICE BOK, April 18, 1960:

This is an action to quiet title.

James A. Gibson died on March 13, 1939, leaving a son, Harlan, and several children of a deceased son. He also left three tracts of farm land, of 99, 74, and 42 acres. The 42 acres were unimproved; the 74 had a house and cottages; the 99 had the homestead and a smaller house, with its curtilage of half an acre, which is the thing in dispute and the subject of Paragraph Fourth of the decedent's will.

Four paragraphs of the will bear on the problem before us:

"Second. I give and bequeath to my son Harlan L. Gibson all my personal property whatsoever it may be in order for Harlan L. Gibson to receive this personal property Harlan L. Gibson is to take care of and support the children of Morris Gibson, deceased, who are now living with me for a period of four (4) years after my death. I request that the children of Morris Gibson obey the orders of Harlan L. Gibson.

"Third. I will and direct that my son, Harlan L. Gibson remain in the house where he now lives or resides and the children of Morris Gibson deceased are

to remain in the house where I now live for a period of four (4) years after my death.

"Fourth. I will and direct at the end of four (4) years After my death that the house and one half (½) acre of land more or less, be sold by my executors and turned into my estate, the one half (½) acre more or less is to be taken from either farm as my executors may see fit. This land or piece of property is to remain as is if there is no indebtedness at the end of four years.

. . .

"Sixth. I will and bequeath to my son, Harlan L. Gibson the farm known as the old Homestead containing ninety nine (99) acres of land less the house and (½) one half acres of land more or less where Harlan L. Gibson now resides to be his, his heirs and assigns."

After decedent's death the inventory of his estate showed no cash and personalty of $1886.80 in farm implements and livestock. His debts were $4889.59, and Harlan, who was executor, claimed credits of $6024.10 in his first and final account filed in 1955. The will was written five months before decedent's death.

The homestead and the small house were close together. Harlan and his wife continued to live in the small house, and decedent's grandchildren, excepting one, continued to live in the homestead. With a hired hand they all worked the farms. Among decedent's debts was a note to one Mertz, of which decedent was co-maker: its original amount was $663. On March 20, 1943, seven days after the four year period mentioned in the will had expired, Harlan paid off the balance of this debt, $153. He then deeded the small house and its half acre to himself and his wife.

In 1955 he and his wife brought this action against his five nephews and nieces, decedent's grandchildren, who claimed the small house and half acre as their own under the residuary clause of the will. The court

below found in favor of the plaintiffs and the grand-children appealed.

The adjudication of the court below contains a résumé of the case with which we are fully in agreement: "The evidence in this case discloses that, upon his father's death, Harlan L. Gibson, knowing what his father wanted him to do, willingly assumed and carried out the burden imposed by his father's will as a loyal and dutiful son. He worked the farms, sold milk, collected rents from cottages, and any other available sources just as his father would have done had he lived, not just for four years, but for five years, and with the money so received, kept the farms in operation and paid off his father's debts.

"Meanwhile, from the same sources, he supported his nephews and nieces, drove them to their activities at the rural high school, transported them to church on Sundays, bought their clothes, gave them commencement presents as they graduated from high school, furnished food and dental care, and, in general, he and his wife kept this family together and cared for them as their own parents, or the decedent himself, would have done.

"Not only has he acted commendably, but he has carried out his father's testamentary design with fidelity and has thereby become entitled, under his father's will, to the house and half acre of land in question in this case."

The court's rationale rests on the theory of an equitable conversion of the real estate because of the direction in the will to sell: *Brandon v. McKinney,* 233 Pa. 481 (1912), 82 A. 764; *Kessler's Estate,* 264 Pa. 422 (1919), 107 A. 776; *Hadesty v. Hadesty,* 331 Pa. 81 (1938), 200 A. 6. The ensuing deed by Harlan to himself and his wife worked a reconversion: *Hadesty v. Hadesty,* supra (331 Pa. 81); *Beal v. Stehley,* 21

Pa. 376 (1853); *Shallenberger v. Ashworth,* 25 Pa. 152 (1855); *Twaddell's Appeal,* 81* Pa. 221 (1875).

Looking inward at the will from its four corners, we think it clear that the decedent meant to put Harlan in control and to reward him accordingly: the grandchildren, once reared, could take care of themselves and were given the balance of the real estate, amounting to about half of it. The "as is" provision in Paragraph Fourth obviously was intended to designate the small house and its bit of land as the source from which to clear the estate of debt by sale if necessary, but to leave it as part of the 99-acre tract if there was no debt. The exemption of this house and land from Paragraph Sixth was designed to be consistent with Paragraph Fourth as a method if paying debts. If there were debts after four years, the house could be considered as converted realty which would pass to Harlan as personalty under Paragraph Second. We regard this not only as the intent of the decedent but as the meaning of his words.

Appellants accuse Harlan of bad faith, as if he had withheld the small debt of $153 until the end of the four years in order to keep the property debt-ridden and subject to conveyance. The court below found otherwise and we agree that there is no reasonable cause, against the background of Harlan's faithful management of the estate, to single out one incident and call it self-dealing. Even if Paragraph Fourth be construed to require a sale, it could be said that Harlan had advanced the purchase price over the years of managing the farms and paying taxes and debts out of his own funds and out of his share of the proceeds. Finally, taking appellants' argument that "if the debts were paid off then the real estate was not to be sold but (was) to remain 'as is'", the debt-paying scheme of Paragraphs Fourth and Sixth did not come into play at all and the small house and land remained part

of the 99 acres and passed to Harlan under Paragraph Sixth.

Appellants also complain because Harlan conveyed the property to himself and his wife without an order of court. This was not illegal: he merely took a chance on its later being approved: *Hill's Estate,* 250 Pa. 107 (1915), 95 A. 426.

Wills are not to be interpreted in a vacuum. A testator's intent must be taken from the meaning of his words, but his will and a dictionary cannot always solve problems of interpretation. In *Beisgen Estate,* 387 Pa. 425 (1956), 128 A. 2d 52, we said: "The testator's intention must be ascertained from the language and scheme of his will." In *Newlin Estate,* 367 Pa. 527 (1951), 80 A. 2d 819, we said: "The testator's intent must be ascertained by a consideration of the entire will which of course must be read in the light of the circumstances surrounding him when he made it." And in *Conlin Estate,* 388 Pa. 483 (1957), 131 A. 2d 117, we said: "The surrounding circumstances include the amount, kind, and condition of his property, his family and all the natural objects of his bounty, as well as his relations with and the condition of his family and his beneficiaries and all claimants to any part of his estate . . . Placing ourselves in the armchair of the testatrix *for the purpose of ascertaining her intention as expressed in the language of her will,* we find the following circumstances which surrounded her and of which she had knowledge at the time she executed her holographic will," etc. (Original emphasis).

The language of the will before us is by no means so pitilessly clear as to be self-executing. The court below was right in surveying the decedent's situation in the search for his meaning.

The decree is affirmed at appellants' costs.