Turner Estate.

Argued May 3, 1962. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN and O'BRIEN, JJ.

reargument refused November 8, 1962.

*Cuthbert H. Latta,* with him *Robert C. Haberstroh,* for appellant.

*Martin Goodman,* with him *John R. Strawmire,* and *Goodman and Notopoulos,* for appellee.

OPINION BY MR. JUSTICE BENJAMIN R. JONES, October 5, 1962:

A narrow issue is presented: whether testatrix' holographic will revoked *by implication* the provisions of an earlier will of testatrix?

L. May Turner (testatrix), an 87 year old Altoona resident, died on June 28, 1959. Testatrix, a spinster, left three wills in *physical* existence: (1) a lawyer-prepared will dated January 29, 1958 (herein called first will) to which there was a codicil dated August 20, 1958; (2) a will drawn by testatrix dated June 25, 1959 (herein called second will); (3) a holographic will dated June 26, 1959 (herein called third will). The third will was probated by the Register of Wills of Blair County on July 1, 1959. Three and one-half months later Mary P. Turner (appellee)[1] appealed from the probate of the will on the ground that the second will should be probated with the third will.[2] After hearing, the Orphans' Court of Blair County sus-

---

[1] Mary P. Turner is the widow of James Lisle Turner, a nephew of testatrix who predeceased her. Admittedly, testatrix was very fond of both James Lisle Turner and Mary P. Turner.

[2] When appellee *originally* appealed from the probate of the third will she averred that the third will did not revoke the first will or its codicil and asked that the first will and its codicil be probated with the third will. At the hearing appellee sought to amend her petition to request probate of the second, rather than the first, will and the court below properly permitted such amendment.

tained the appeal and opened the decree of probate to enable the Register to act upon a petition for the probate of the second with the third will. From that decree this appeal was taken.

At the outset the respective contentions of the parties should be clarified. Testatrix' estate, valued at approximately $69,000, was composed of household and personal effects inventoried at approximately $500, cash (or its equivalent) approximating $14,500 and securities inventoried at approximately $54,000. *Concededly*, the third will effected a testamentary disposition of the household and personal effects and cash. The instant controversy involves only the disposition of testatrix' securities.

In testatrix' second will, her "stocks and other investments" were given to appellee and James W. Turner (appellant).[3] Appellant contends that the third will is inconsistent with the provisions of the second will and, thus, the second will was impliedly revoked by the third will; that, in particular, that provision in the second will which disposed of testatrix' "stock and other investments" was revoked by the overall dispositive scheme of the third will and by the gift by testatrix of the "balance" of her "money" to appellant, "money" being construed in the broad sense of "estate" or "property". Appellee contends that no revocation by implication of the second will has taken place and, in particular, there exists no inconsistency in the disposition of testatrix' "stocks and other investments" in the second will and the gift to appellant of the "balance" of her "money", the latter being construed in its narrow sense of "cash".

---

[3] James W. Turner, a nephew of testatrix, survived testatrix but died during the pendency of this proceeding. His interest is represented by Ada R. Turner, his widow and administratrix. For the sake of convenience, we refer to both James W. Turner and Ada R. Turner as appellant.

In passing upon these contentions we must ascertain, if at all possible, the intent of the testatrix. Such intent ". . . must be gathered from a consideration of (a) all the language contained in the four corners of [her] will[4] and (b) [her] scheme of distribution and (c) the circumstances surrounding [her] at the time [she] made [her] will and (d) the existing facts; . . .:" *Burleigh Estate,* 405 Pa. 373, 376, 175 A. 2d 838.

For the purpose of this appeal, certain facts may be considered as conceded or not seriously disputed: (a) all three wills are valid and genuine wills; (b) testatrix made the interlineations and alterations which appear in the second will; (c) at all times testatrix possessed testamentary capacity; (d) testatrix was very fond of James L. Turner, James W. Turner and their wives; (e) the first will, changing the provisions of previous wills, was occasioned by reason of the death of James L. Turner in 1957; (f) testatrix' very close friend and legatee in previous wills, a Miss E. K. Eyre, died and her death triggered the preparation of the second will; (g) testatrix was a very intelligent woman who knew and understood the difference between cash, securities and other specie of property.

Bearing in mind this background we examine the pertinent provisions of all three wills and the circumstances which surrounded the execution of each will.

Attorney C. M. Kurtz, testatrix' lawyer for approximately twenty years, drew the first will for testatrix on January 29, 1958. James L. Turner having recently died, testatrix explained to Attorney Kurtz that she wanted his "share" of the estate to be given to Mary Turner, his widow. This first will, containing an ex-

---

4 "it is not what the Court thinks [she] might or would have said in the existing circumstances, or even what the Court thinks [she] meant to say, *but what is the meaning of* [*her*] *words.* [citing cases]": *Britt Estate,* 369 Pa. 450, 455, 87 A. 2d 243; *Cannistra Estate,* 384 Pa. 605, 607, 121 A. 2d 157.

press revocation clause, provided for testatrix' burial and bronze or marble plates for the graves of herself and brother, the care of her parents' burial plot, bequests of $1,000 to each of her two nephews' children, gave "the remaining *cash*" in equal shares to appellant, appellee and Miss Eyre and then gave testatrix' "stocks and other investments" in equal shares to the same three persons.[5] The first will further directed that for three months after her death the expenses of her apartment be borne by the estate, that household effects and personal belongings be given to Miss Eyre and Attorney Kurtz and Miss Eyre act as the personal representatives. In the codicil to that will—prepared by Attorney Kurtz—testatrix directed that the trust provisions for Miss Eyre include her share of the "cash" and that "the inheritance tax on all my bequests be paid by my said estate."

Miss Eyre died on May 29, 1959 and on June 8, 1959, at testatrix' request, Attorney Kurtz visited testatrix. Testatrix indicated that, due to Miss Eyre's death, she wanted to change her will but she was too weak at the time to discuss the contemplated changes and she gave the original of the first will and codicil thereto to Attorney Kurtz requesting that he keep them until she was able to make the contemplated changes. On June 23 and June 24 Attorney Kurtz visited testatrix but again she was too weak to discuss the contemplated changes and, on the latter occasion, testatrix was informed by Attorney Kurtz that he would be out of town for several days but would see her again on June 30.

On June 25, 1959, testatrix decided to make her own changes in the will. For that purpose she utilized an

---

[5] The share of Miss Eyre was to be held in trust to pay the income to her during her lifetime and, upon her death, to be divided equally between appellant and appellee.

unsigned *copy of the first will* upon which she made various alterations, additions and interlineations in her own handwriting. Testatrix struck out the provision concerning plates for the graves of her brother and herself and increased the amount of the gift for the care of her parents' burial plot by crossing out the word "two" and writing above it the word "three". By striking out the figure "$1000" and inserting "(2) Two", "2 Thousand" or "2,000" she sought to increase the bequests to her nephews' children from $1000 to $2000. The provision in the first will providing for a division of testatrix' "stocks and other investments" into "three equal parts" (one each for appellant, appellee and Miss Eyre) was altered by the insertion of the word "two" instead of "three" and by striking out the provisions for distribution of one of the parts to Miss Eyre. The provisions for the trust for Miss Eyre, for the maintenance of the apartment for three months after her death, for the gift to Miss Eyre of the household effects and personal belongings were stricken and Miss Eyre was eliminated as a personal representative. Initially, the First National Bank of Altoona and, later, the appellant was substituted in Miss Eyre's place as a personal representative. Testatrix struck out the date in the testimonium clause "29th day of January A. D. 1958" and inserted in place thereof "25th day of June 1959". On the signature line testatrix affixed her signature, an unwitnessed signature the genuineness of which is not questioned.

The next day testatrix drew the third or holographic will on three sheets of ruled paper. On this instrument the date "June 26,-59" appears on the upper right-hand corner of the first page and below, in the top middle of the page, "My last will and testament". This will provides the place of testatrix' burial, that her debts be paid, that the expenses of maintaining her apartment for three months be paid to appellant and that

"all *money* derived from sale" of the household furnishings be given to appellant and that her jewelry and china be sent to appellee for division "among her children". Testatrix inserted the provisions found in the second will for the care of her parents' burial plot and the provision found in the codicil "I direct that the inheritance tax on all . . . my bequests be paid by my said estate." After appointing the First National Bank of Altoona and Attorney Kurtz as her executors, testatrix inserted a testimonium clause and signed her name. Thereafter in the will testatrix gave her "handpainted chocolate set to Mrs. H. W. Turner" adding that the rest of her handpainted china ". . . go to . . . [appellee] . . . to be divided among her children." Testatrix then stated "I give to each person named below, two thousand dollars" and set forth the names and addresses of four legatees,[6] adding that a Mrs. Lucy Turner be given $100. Testatrix then provided *"The balance of my money to be given to Mr. James W. Turner* [appellant] . . ., now living with me," (emphasis supplied) and added a testimonium clause in which she used June 26, 1959 as the new date. Testatrix then drew a signature line upon which she signed her name and two neighbors were called in to sign as subscribing witnesses. On June 27 testatrix sent for the same witnesses, told them she had accidentally destroyed the last page of her will and asked them to witness a new page. The witnesses signed the new page and, at testatrix' request, the date of June 26, 1959 was repeated. Testatrix died in her sleep some time on June 28.

Testatrix had told Mrs. Bishop, one of the subscribing witnesses, that her will could be found in a dresser drawer in her bedroom and, after testatrix' death, there was found in this dresser drawer an envelope sealed

---

[6] That list included appellant's daughter-in-law rather than his son as in the second will.

with scotch tape bearing the inscription "My will 1959". This envelope was turned over to appellant and he gave it unopened to Attorney Kurtz who opened it. In the envelope were a copy of the first will with testatrix' alterations and interlineations thereon (that is, the so-called second will), a copy of the codicil to that will, and the third will.

The narrow issue which we must determine is whether the third will of testatrix has revoked, in whole or in part, the provisions of the second will. Revocation of an earlier will by a later will may be by express or implied revocation (Wills Act of 1947, Act of April 24, 1947, P. L. 89, §§5, 6; 20 P.S. §§180.5, 180.6). In the case at bar, there is no *express* revocation: if the third will revokes the second will, in whole or in part, such revocation must be by *implication*. In *Gray Will*, 365 Pa. 411, 416, 76 A. 2d 169, this Court stated: ". . . the declaration of revocation need not be express, it may, under the authorities, be by necessary implication. An earlier will can be revoked by a later will or other writing . . . which disposes of an estate in an entirely different manner than the earlier will and is inconsistent therewith." See also, *Kehr Will*, 373 Pa. 473, 95 A. 2d 647. "If the dispositive provisions of the later will are inconsistent with the dispositive provisions of the earlier will, the later will revokes the earlier will just so far as it is inconsistent with it and no farther": 2 Bowe-Parker, Page on Wills, §21.43, p. 412. See also: *Price v. Maxwell*, 28 Pa. 23, 38; *Gensimore's Estate*, 246 Pa. 216, 92 A. 134; *McClure's Estate*, 309 Pa. 370, 165 A. 24; *Hartman's Estate (No. 1)*, 320 Pa. 321, 182 A. 234; *Burtt Will*, 353 Pa. 217, 44 A. 2d 670.

In determining whether the third will is inconsistent with the second will to the extent that the provisions of the latter are revoked we must look to the dispositive scheme of both instruments and from the language employed by testatrix in the third will ascertain her intent.

A comparison of the provisions of the second and third wills is important:

| Second Will | Third Will |
|---|---|
| 1 Direction that debts and funeral expenses be paid | 1 Direction that "all debts" be paid |
| 2 Direction that burial be in Alto Rest Cemetery | 2 Same |
| 3 Gift of $300 to 1st National Bank of Altoona for care of parents' burial plot | 3 Same |
| 4 "All the cash of which I die possessed or entitled, *after the payment of my just debts*,* I give and bequeath the same as follows: | 4 "I give to each person named below, two thousand dollars |
|    (a) $2000 to nephew, J. P. Turner |    (a) same |
|    (b) $2000 to niece, Louise Turner |    (b) same |
|    (c) $2000 to niece, Marjorie M. Parker |    (c) same |
|    (d) $2000 to nephew, H. W. Turner |    (d) to Mrs. H. W. Turner |
|    (e) No provision |    (e) To Lucy Turner, $100 |
| 5 "All the *remaining cash** of which I die possessed or entitled" to James W. Turner, Mary P. Turner and Elizabeth K. Eyre | 5 No similar provision |
| 6 "All the stocks and other investments of which I die possessed or entitled" to Mary P. Turner and James W. Turner | 6 No similar provision |
| 7 Executors named — Attorney Kurtz and James W. Turner | 7 Executors named — 1st National Bank of Altoona and Attorney Kurtz |

* Emphasis supplied.

| | |
|---|---|
| 8 No similar provision | 8 All expenses of apartment to be paid for three months to James W. Turner |
| 9 No similar provision | 9 "All *money** derived from sale of home furnishings" to James W. Turner |
| 10 No similar provision | 10 All jewelry and handpainted china — with the exception of handpainted chocolate set given to Mrs. H. W. Turner —to Mary P. Turner to be divided among her children |
| 11 No similar provision | 11 Direction that "the inheritance tax on all my bequests be paid by my said estate" |
| 12 No similar provision | 12 "The balance of my *money** to be given to" James W. Turner |

From an analysis of both wills certain facts become evident: (1) the third will *completely* disposes of testatrix' household furnishings and personal effects; (2) the third will provides $8100 is to be paid out in pecuniary legacies without designating the source from which such legacies are to be paid;[7] (3) only the second will makes any reference to testatrix' securities; (4) only the third will makes all bequests tax free; (5) the second will makes no reference to *money* but twice to *cash* and the third will makes no reference to *cash* but *twice to money;* (6) only in the direction for payment of debts and funeral expenses, for testatrix' place of burial and for care of testatrix' burial plot are the wills similar.

---

* Emphasis supplied.

[7] Cf: the provision in the second will provides for payment of $8000 in pecuniary legacies from "cash" after payment of debts, i.e., the source from which the legacies are to be paid.

Up until the clause: "The balance of my money to be given to Mr. James W. Turner . . ." the dispositive plan of the third will is clear. Testatrix first wanted her debts and funeral expenses paid and provision made for perpetual care of her parents' burial plot; next, the five named persons were to receive legacies totalling $8100 and appellee and Mrs. H. W. Turner were to receive the jewelry and china as spelled out and, by the inclusion of the tax free clause, each legatee was to receive his or her legacy without diminution; next James W. Turner, who lived with appellant,[8] was to have expense-free the apartment for three months and the proceeds of the sale of the furnishings; lastly, the *"balance"* of her *"money"* is given to James W. Turner. What did testatrix mean by "money"?

Dehors the third will, the record is clear that testatrix knew the amount of *cash* available to meet the requirements of her will; as an intelligent woman handling her own affairs she knew her checking account had a balance of slightly in excess of $4700 and, having visited her safety deposit box only three weeks before the time she made the third will, it is logical to assume she knew she had slightly in excess of $8,500 in that box, or a total of $13,000 in cash or available cash. Over and above such cash she had assets the equivalent of cash amounting to approximately $1,500.

She knew, because she so provided in her third will, that her debts and funeral expenses and death taxes would have to be paid. As an intelligent woman she also knew that administration expenses, such as execu-

---

[8] James Turner and his wife, both in very poor health, had lived with testatrix since Miss Eyre's death. Thirteen days before she died, testatrix wrote appellee: "Poor Jim [James W. Turner] is suffering terribly with his leg . . . . Ada [James W. Turner's wife] can do very little, really is not able to do anything . . . . Just three invalids together . . . . It is a problem no one can solve but God . . . ."

tors and attorney's fees, would have to be paid, although she would not know the amount thereof.[9]

It would appear that the total cash, or its equivalent, available for payment of debts, funeral expenses, perpetual care of the burial plot, death taxes, administration expenses and the pecuniary legacies would be approximately $14,500. The result is that, if appellee is correct in her contention that the specific gift of the securities in the second will stands unrevoked and the securities are unavailable to share in the payment of these expenses, taxes and legacies, each legatee will receive approximately 34% of the amount given to him by testatrix. While such a result per se does not dictate a construction of revocation *by implication*, it is a factor to be considered in ascertaining testatrix' intent under the instant circumstances. It is clear from the four corners of testatrix' will that she not only wanted her debts, taxes and expenses paid but that she wanted her pecuniary legacies paid in full without any diminution and that her *cash* on hand was not to be the sole source for the payment of such legacies.[10]

In our view, the dispositive scheme of the third will clearly contraindicates the position of appellee and the court below. Appellant well urges: "[Testatrix] must have intended all of [the pecuniary legacies] to be paid at par;[11] and if she intended that, then she must have intended the stocks to be available for the support of the legacies; and if she intended that, then she could *not* have intended to make a specific gift of the stocks."

---

[9] Death taxes are $8600 and administration expenses $8800.

[10] A contrary view would also render meaningless the gift of the proceeds from the sale of the household furnishings to appellant.

[11] In this connection the language of the second and third wills must be contrasted. Instead of establishing her "cash" as the source of payment of the legacies as she did in the second will, testatrix in the third will, provided: "I give to each person named below, two thousand dollars".

Furthermore, the factual situation presents a picture of a careful testatrix, anxious to put her affairs in order, who in drafting her new will has before her a copy of the first will and codicil and the second will. In both the first and second wills testatrix made specific gifts of the securities whereas in the third will she completely avoided reference to her securities. It is unthinkable that this careful testatrix, so anxious to set her house in order that she couldn't wait a few days until the return of her lawyer, would have omitted to provide in the third will for a gift of her securities to appellee and appellant, if that is what she intended. The fact of the omission of such reference is highly significant in ascertaining testatrix' intent.

In the third will testatrix states: "The balance of my *money* to be given to Mr. James W. Turner . . ." (Emphasis supplied). Does money in the sense used by testatrix mean "cash" or does it mean "property" or "estate"—if the latter, then this language clearly revokes, by reason of inconsistency, the gift of securities contained in the second will.

In *Smith v. Davis,* 1 Grant 158, Mr. Justice WOODWARD, speaking for this Court, said: "On such a question, adjudged cases are of no value farther than to show, what the authorities abundantly prove, that the word *money* in a will, may be construed to mean cash, or may stand for the whole personal estate, as the intention of the testator, deduced from every part of the will, may seem to require. It is to be received in its restricted and proper sense, or in its more enlarged signification, as it will best effectuate the general intention of the testator; and because wills differ more than men's faces, it can rarely happen that the construction given to this word in one will, shall help us any in interpreting its meaning in another. " (pp. 158-9) "Money" has received in our decisions various constructions. The sound rule would appear to be that

recently affirmed by this Court in *Conlin Estate,* 388 Pa. 483, 489, 131 A. 2d 117 wherein we approved that which was said in *Ingham's Estate,* 315 Pa. 293, 172 A. 662: ". . . under our cases the word 'money' when used in a will, is to be construed in the broad sense of wealth or property, instead of in its narrow sense as cash, *only where the context of the will and the circumstances surrounding its execution require that it be so interpreted in order to give effect to the testator's intention*: [citing cases]." In *Lewis Estate,* 407 Pa. 518, 180 A. 2d 919, we very recently held, in a situation somewhat apposite to the case at bar, that a gift of " 'All remaining money after debts and bequests are paid' " was intended to be "a gift of all . . . [the] residuary personal estate, including cash, stocks and bonds." The Court stated (p. 521) : "However, it is equally well settled that where a testator indicates an intention to dispose of his entire estate by a gift of 'money', especially if the gift as here is in a residuary clause, a gift of money will pass all his personal property or all the rest of his personal property, as the case may be: Conlin Estate, 388 Pa. 483, 131 A. 2d 117, and cases therein cited." See also: *Estate of Jacobs,* 140 Pa. 268, 21 A. 318; *Ostrom v. Datz,* 274 Pa. 375, 118 A. 313; *Talbot v. Anderson,* 292 Pa. 454, 141 A. 256; *Williamson's Estate,* 302 Pa. 462, 153 A. 765; *Ingham's Estate,* supra; *Bricker's Estate,* 335 Pa. 300, 6 A. 2d 905.[12]

In *Conlin Estate,* supra, pp. 493, 494, Mr. Justice (now Chief Justice) BELL, speaking for this Court, noted that our decisions wherein "money" was interpreted in a broad sense involved situations: (a) where "the gift of the rest or remainder or balance of 'my

---

[12] For cases construing "money" in a narrow sense, see: *Levy's Estate,* 161 Pa. 189, 28 A. 1068; *Watson v. Martin,* 228 Pa. 248, 77 A. 450; *Clabby's Estate,* 338 Pa. 305, 12 A. 2d 71; *McKown's Estate,* 263 Pa. 258, 106 A. 301; *Dickson v. Com. Trust Co.,* 361 Pa 612, 65 A. 2d 408.

money' was contained in a residuary clause"; or where (b) other language in the will "showed that it was used and intended in its broader meaning." From the position in the will of the clause giving to James W. Turner the "balance" of her money and from the contents of the will *in its entirety* it seems evident that testatrix intended the clause as a residuary clause and that testatrix clearly employed the word "money" in its broad sense and intended to give James W. Turner the balance of her "estate" or "property" including her securities. Such intent seems clear and self-evident from an examination of the third will as well as the circumstances attendant upon its execution.

It may be urged that the result reached is inequitable in view of the fact that testatrix was very fond of Mary P. Turner and, under our interpretation, Mary P. Turner is deprived of a share in a division of testatrix's securities. As this Court stated in *Conlin Estate,* supra, pp. 488, 489: "[Appellee] mistakenly believe[s] that by placing himself in the armchair of the testatrix, a Judge can thereafter distribute the testatrix's estate in accordance with good morals and equity among her relatives and friends as a reasonable man seeking to be fair would do. Of course, that is not and never has been the law. . . . It is not what a Judge, if he had been sitting in [testatrix's] armchair, and moralizing, thinks that the testatrix should in equity and in good conscience have done . . . ." The language of this will and the circumstances surrounding its preparation command the result we have reached. No other result is consonant with testatrix' intent evidenced by the language of this will.

The rationale of the court below by which it reached the conclusion that testatrix did not by implication revoke the second will's provision as to "stocks and other investments" is set forth at length in its opinion.

In the first place, that provision in the third will which gave the *"money"* derived from the sale of the household furnishings to appellant was doubly significant to the court: (a) since "money" in that provision clearly meant "money" in the narrow sense of "cash", the word "money" in that provision which gave the "balance" of testatrix' "money" to appellant was likewise used in a narrow sense; (b) if "money" in the last provision is interpreted in its broad sense, the first provision in the will employing the word "money" would become mere surplusage. Were there no *other* guideposts in this will as to testatrix' intent we would be inclined to agree with the court in the significance to be attached to the double use of the word "money", but such other guideposts weakened considerably any such significance. The interpretation in a broad sense of the provision providing for a gift of the balance of the "money" does render superfluous the earlier provision employing the term "money" but that is neither unusual nor uncommon in home drawn or "do-it-yourself" wills; under the factual situation in the case at bar any significance to be attached is very slight. While the manner in which "money" is used in the first provision is an *aid* in construing "money" in the last provision it certainly is not determinative of the issue.

In the second place, the court below noted that at the time of her death testatrix had $13,314.03 in cash assets,[13] and, after the payment of $8,100 in pecuniary bequests, there would be a balance of "$5,214.03 in ready money still remaining" of which fact testatrix would have been aware. Therefore, the court concluded that testatrix' "plain direction ["The balance of my money to be given to James W. Turner"] is that James W. Turner is to have the excess of the bank funds over

---

[13] In the safe deposit box was $8,586.55 and in the checking account $4,727.48.

and above the sums specifically bequeathed". The fallacy of this conclusion is evident; the court completely overlooked that which the testatrix did not overlook. From reading the third will it is clear beyond question that the testatrix realized that, in addition to the payment of the pecuniary legacies, payment would have to be made of her debts, her funeral expenses, for perpetual care of her parents' burial plot and death taxes; in fact, testatrix in her will not only directed such payments but, in the case of the taxes, directed how they were to be paid. While there is no direct proof of knowledge on the part of testatrix, it is only logical to assume that testatrix, portrayed upon this record as a highly intelligent woman, knew that her executors and attorney would have to be paid as well as other expenses incurred in the settlement of her estate. In failing to give consideration to the fact that these items were payable from the assets of this estate the court below erred: it failed to accord to this factor the probative value to which it was entitled: *Jackson's Estate,* 337 Pa. 561, 12 A. 2d 338.

Furthermore, the court stressed the absence of an express clause of revocation in the third will as indicative of a lack of intent to revoke the provisions of the second will. In our view, the absence of such an express clause of revocation is of little significance when one considers the third will in its entirety. The court also pointed out that in the sealed envelope which was marked "My will 1959" were included not only the third will but also the altered copy of the first will and concluded that "the inclusion of both documents therein was solely the act of the testatrix and that her purpose in so doing was that the rest of her property—namely her stocks and investments—undisposed of by the holographic instrument should pass in accordance with the provisions of the altered carbon copy." In appellant's brief this conclusion of the court is com-

pletely answered: "The court in effect read the inscription as saying 'everything inside is my will'. The inscription does not say that; its message is simply, 'my will is inside'. We do not gainsay that message by treating the third will as the only effective one: it was in fact inside. Here the unsigned copy of the first will's codicil becomes important: it was inside the envelope and yet it was admittedly inoperative. This disproves the notion that everything inside was part of the will. If despite the inscription that envelope could contain one inoperative paper, why not two? They were the work sheets for the will, and it was quite natural for Miss Turner to keep them with it."

Under the construction placed on the third will by appellee and the court below 90% of testatrix' estate would pass under the second will and 10% under the third will; under appellant's construction the bulk of the estate would pass to James W. Turner's estate to the practical exclusion of appellee. Bearing in mind that testatrix was equally fond of both James W. Turner and Mary P. Turner, the widow of James Lisle Turner, it is urged that testatrix could not have intended to prefer the former to the latter. We cannot *know* with any certainty why testatrix made such preference although it is evident she did. The record indicates that, when the third will was executed, both James W. Turner and his wife, living with the testatrix, were in such a state of health as to be termed "invalids" by testatrix. Concern for their care after testatrix' death might have prompted making the third will. Regardless of the reason it is evident that testatrix intended to make James W. Turner the principal object of her bounty.

In our view, the language of the third will viewed in its entirety, the dispositive plan portrayed therein and the circumstances which surrounded the execution of this third will clearly indicate that it was the intent

of the testatrix to revoke all of the provisions of the second will and to give appellant not only the "balance" of "cash" but also the "balance" of "her property" and "estate", including the stocks and other investments.

Decree reversed. Costs on estate.

———

DISSENTING OPINION BY MR. CHIEF JUSTICE BELL:

Mr. Justice JONES has ably stated the law and clearly set forth the facts, as well as the narrow question involved. I regret I must differ with him in the inferences and conclusions which he has drawn therefrom.

Justice JONES holds that the word "money" in the residuary bequest in Miss Turner's third will meant and included not only "money", but also "stocks and other investments". Testatrix drew and signed her second will and the next day drew and signed her third will, and two days later died. Although testatrix was an invalid, it was agreed, (a) that she had testamentary capacity, and (b) that she was fond of all the legatees, and (c) that at all times testatrix was a very intelligent woman who knew the difference between cash and stocks and other investments.

The most difficult problem in connection with wills is the interpretation of a holographic will, and this will is no exception. My reasons for believing that the third will repealed, by implication, only those parts of the second will which are inconsistent with the second, are as follows: Testatrix demonstrated that she knew the difference between cash or money, on the one hand, and stocks or investments, on the other hand, in her first and second wills, and this knowledge is admitted by the parties. In her second will she changed the equal division of her stocks and other investments from three persons to two persons, because of the recent

death of one of the three original legatees. In the third, as well as in the second will she gave cash to four named nephews and nieces—$8,000 in the second will, $8,100 in the third will. In the second will she provided: "All the stocks and other investments of which I die possessed or entitled to Mary P. Turner and James W. Turner". In her third will she gave "all money derived from sale of home furnishings to James W. Turner". She then gave "the balance of my money to be given to James W. Turner", thereby (according to the majority) giving James W. Turner all her stocks and other investments and completely eliminating Mary P. Turner (of whom it is admitted she was very fond), from any share in these investments. The majority assert that in this third will testatrix (a) clearly showed that she used the word "money" in its usual narrow sense, i.e., "cash" when she gave to James W. Turner "all money derived from sale of home furnishings", but (b) used "money" in its broad sense, i.e., property, stocks and other investments, when she gave James W. Turner "the balance of my money". Considering the fact that this testatrix knew the difference between money and stocks and other investments, and that she clearly used the word "money" as meaning cash in the gift to James W. Turner of "all money derived from sale of home furnishings", I can find no justification for holding that she used "money" *in an entirely different sense* when she gave "the balance of money to be given to James W. Turner".

In her third will, testatrix not only failed to revoke her second will, which she had drawn and signed the day before, but far more importantly, she put the second and third wills in a *sealed envelope* which she marked *"My will 1959"*. To me her intent from this act is clear—(1) she wished and intended both wills, the second and third wills, to be her last will and testament, and (2) the third will was not intended to com-

pletely revoke the second will, as the majority hold, but only to be construed together with it and to revoke only those parts of the second will which were inconsistent with the third will.

I would therefore hold that both the second will and the third will should be admitted to probate and construed as above set forth.

Mr. Justice O'BRIEN joins in this dissenting opinion.