## Gill v. City of Sharon

*Albert E. Acker*, for plaintiffs.
*W. Allen Dill*, for defendants.

McKAY, J., August 31, 1964.—In this case plaintiffs seek to enjoin the City of Sharon from interfering with its business operation in liquidating its stock of electrical merchandise at its store on South Main Avenue in the City of Sharon. The case came on for preliminary hearing on August 26, 1964, at which testimony was taken on behalf of plaintiffs and defendants. It appeared from the testimony that plaintiffs had conducted what is known as a "going out of business" sale on their said premises from May 5 to July 5, 1964, and that during those two months they substantially complied with the requirements of the Act of July 31, 1963, P. L. 410, which lays down the conditions under which such sales may be lawfully conducted, including the application for a permit, the furnishing of a bond, and the like.

The present controversy arose when, after that period, plaintiffs continued to do business at the same location, a procedure which, in our opinion, the law is designed to prevent. It was not plaintiffs' intention to defraud the public by so doing, but they were of the opinion that they had the right to continue with their sale for at least a reasonable period until they had disposed of their merchandise, provided they did not continue to advertise their continued operation as a "going out of business" sale.

During the hearing it developed that, while plaintiffs did not advertise generally after July 6th, that they were going out of business, they did not eliminate a painted notice to that effect, which appeared on the side of their building until shortly before the hearing.

In our opinion, plaintiffs violated the above-mentioned statute in continuing to do business at the same premises after July 5th, but we are equally satisfied that they did so in good faith, under the belief that they had the legal right to continue to attempt to dispose of their merchandise in that place as long as they did not advertise in such a way as to misrepresent the nature of their operation.

Inasmuch as this is a case of first impression in Pennsylvania, construing the Act of 1963, and, in the absence of such interpretation, plaintiffs were not aware that they violated the statute, but believed in good faith that they were complying with it, we are disposed to use our equitable powers so as to do justice as nearly as possible in the case before us and to give plaintiffs a reasonable time within which to close out their business. This disposition of the present case must not, however, be taken as a precedent for other persons who in the future attempt to close out their business in the same manner that these plaintiffs have done. In any future cases, the maxim, ignorance of the law excuses no man, will be applied and the penal provisions of the act should be enforced in ordinary course.

### Order

Now, August 31, 1964, it is ordered and decreed that the City of Sharon and their police officers are enjoined from proceeding criminally or civilly against plaintiffs under the Act of July 31, 1963, P. L. 410, prior to November 1, 1964, until which time plaintiffs may proceed to liquidate their merchandise at their Main Avenue store in the City of Sharon, unless plaintiffs again advertise their operation as a "going out of business" sale. The use of such terms in advertising as "clearance sale," "surplus store liquidation sale," "special purchase sale," or similar language shall not be interpreted as a "going out of business sale." The costs shall be paid by plaintiffs.

## Abele Estate

Before Klein, P. J., Bolger, Lefever, Saylor, Shoyer and Burke, JJ.

ADJUDICATION

SHOYER, J., December 11, 1963.—This trust arises under the will dated August 24, 1924, a copy of which is hereto annexed, of Charles S. Abele, who died February 7, 1941, whereby in Item Fourth testator gave his residuary estate to his executors, in trust, "to invest and reinvest the same during the lives of my brothers, Robert J., Joseph B., and Julian F. Abele, and my sisters, Elizabeth R. and Mary Adelaide Cook, and the life of the survivor of them, and during the continuance of the said trust to pay the net income therefrom quarterly in equal shares unto my said brothers and sisters above-named, and upon the death of any of them to pay the share of income of the one so dying unto such of his or her children and issue of deceased children as

may be living at each quarterly period of distribution, equally, absolutely, per stirpes, and in default of such issue living at any quarterly period of distribution to pay the said share of income unto such of the survivors of my said brothers and sisters as may be living at the said quarterly periods of distribution, and the children and issue of deceased children of such of them as may then be dead leaving issue, equally, absolutely, per stirpes.

"And upon the death of the survivor of my said brothers and sisters to transfer, assign and pay over the principal of my said residuary estate unto such of the children and issue of deceased children of my said brothers and sisters as may be living at the time fixed for the said distribution, equally, absolutely, per stirpes."

The fund being here accounted for was awarded to the accountant, surviving trustee, by the adjudication of Boland, J., dated November 9, 1950, in further trust for the uses declared in the will.

This account was filed because of the death on December 4, 1962, of Joseph B. Abele, the last survivor of the five named brothers and sisters of testator. His death terminated the trust. It appears from the statement of proposed distribution that Joseph left no children or issue him surviving. He left a will upon which letters testamentary were granted by the Register of Wills of Philadelphia to Beulah H. Abele, executrix. . .

The statement of proposed distribution and the notice to the parties in interest raise two questions which require adjudication. (1) May the daughter of testator's nephew, Robert Waring Abele, deceased, share in the remainder; and (2) do the nephews and nieces entitled to the remainder take per capita or per stirpes.

A family tree prepared by the accountant was ad-

mitted into evidence as Accountant's Exhibit No. 1, with an addendum thereto, Exhibit No. 1-A (N. T., pp. 38-39).

The family tree shows that testator had eight brothers and three sisters. Four brothers, Thomas, Harry, a second Harry and Fred, each of whom died in infancy, or early teens, unmarried and without issue prior to August 22, 1924, the date of the will.

Ernest Abele, a brother of testator not mentioned in the will, predeceased testator. He died in 1920, four years before testator executed his will. Ernest was survived by one child, Robert Waring Abele, who was born in 1907, and died August 10, 1961. Robert Waring Abele was survived by a daughter, Barbara Abele Daly, who was born in 1933, and is living.

Barbara Abele Daly claims a share of the remainder.

Three brothers, Robert J. Abele, Julian F. Abele and Joseph B. Abele, and two sisters, Elizabéth R. Cook and Mary Adelaide. Cook, were living in 1924, when testator made his will. The term of the trust expired upon the death of the survivor of these named brothers and sisters.

Robert J. Abele, a brother, predeceased testator. He died in 1929, leaving to survive him a daughter, Dorothy Abele Gatling, who was born in 1897, and is still living.

Elizabeth R. Cook, a sister of testator, who was one of the life tenants, survived testator and died December 4, 1943, leaving to survive her four children, namely, Elizabeth A. Faulkner (born in 1896), Marie L. Cook (born 1898), John F. Cook (born 1899), and Julian A. Cook (born 1904), each of whom is still living.

Julian F. Abele, a brother of testator, a life tenant, died April 23, 1950, leaving to survive him two children, Julian F. Abele, Jr. (born 1926), and Nadia Abele Reed (born 1931), both of whom are still living.

Mary Adelaide Cook, a sister of testator, life tenant, died February 11, 1952, leaving to survive her four children, namely, Adelaide Cook Daly (born 1896), Charles C. Cook (born 1897), Mary D. Cook (born 1903), and Enid Cook Rodaniche (born 1906), each of whom is living except Adelaide Cook Daly. Adelaide died April 26, 1954, leaving to survive her two children, Peggy Watters Daly (born 1920), and Millicent Cook Daly (born 1922), both of whom are living.

Charles C. Cook, above-mentioned son of Mary Adelaide Cook, is here represented by Eugene A. Chase, Esq., committee of his person and estate, so appointed by the United States District Court for the District of Columbia. A certified copy of the decree of appointment is hereto annexed.

Joseph B. Abele, brother of testator and last surviving life tenant, as noted earlier, died December 4, 1962, without leaving issue to survive him.

(1.) *Should Barbara Abele Daly, daughter of Robert Waring Abele, deceased, share in the remainder?*

The accountant and all the other parties in interest take the position that Barbara Abele Daly is *not* entitled to share in the remainder. They point out that in the first of the two paragraphs comprising Item Fourth of the will, quoted in full at the beginning hereof, testator named his three brothers, who were alive when he wrote the will in 1924, and gave them and the issue of any of *them* who may die the income during the life of the trust.

In the second paragraph of Item Fourth he provided that "upon the death of the survivor of my *said* brothers and sisters to transfer, assign and pay over the principal of my said residuary estate unto such of the children and issue of deceased children of my *said* brothers and sisters as may be living. . . ." (Italics supplied.) "Said," it is contended by counsel opposing

Barbara's claim, means *before mentioned*—brothers and sisters. Barbara's paternal grandfather, Ernest Abele, father of Robert Waring Abele, is not mentioned, eo nomine, either in Item Fourth or in any other part of the will. Ernest died in 1920, before the will was executed. Furthermore, in Item Third of his will testator gave $5,000 outright to his nephew, Robert Waring Abele, and provided that if Robert should die before reaching age 21 the legacy to him should lapse. The *$5,000 legacy was paid to Robert* when testator died. Except for this bequest to Robert and a bequest of personal effects to testator's sister, Elizabeth R. Cook, no beneficiaries are named in the will other than in Item Fourth. While Robert, the nephew, was favored by the outright gift of $5,000 immediately on his uncle's death, the other nephews and nieces, children of the five named brothers and sisters were favored in the residue, to the exclusion of Robert.

Counsel for Barbara vigorously urged that Robert was a favorite nephew of testator; that when the scrivener referred to "the children and issue of deceased children of my said brothers and sisters . . .", he, the *scrivener*, mistakenly thought that Robert Waring Abele was a child of one of the named "said" brothers.

Over the objection of counsel, Barbara Abele Daly, her mother, Barbara Matheas Abele, and her grandmother, Hazel Matheas, testified in support of Barbara's claim.

Their testimony did not touch on the execution of the will. Their testimony was confined to the circumstances surrounding testator during the period from 1920 to his death in 1941. While the circumstances surrounding testator are always admissible in construing a will and to ascertain the intention, the evidence produced has no bearing on the burden assumed. The argument by counsel is untenable, contrary to the

plain language of the will and the evident intent of testator. The word "said" in the context used does not refer to or indicate nephews or nieces but, plainly, "brothers and sisters" and only such of his brothers and sisters as testator *named* in Item Fourth. It does not include a nephew named in Item Third.

It is important to note that in 1924, when he wrote his will, testator had three brothers, two sisters and eight nephews and nieces living in addition to his nephew Robert. Yet he signaled out his nephew Robert for what in 1924 was a substantial gift of $5,000. In all the circumstances we are warranted in assuming that testator thought that he had amply provided for his nephew Robert by his gift of $5,000, and because of that gift intentionally excluded Robert and Robert's issue from sharing in the residue. Claimant has produced no evidence as to the size of testator's estate in 1924, so we must conclude that testator believed he was dealing fairly with all his heirs regardless of what Robert, Robert's heirs, or outsiders might think. In any event, Barbara was born in 1933, and her father survived testator, yet testator in the 17 years following the execution of his will made no change in its provisions.

There is no ambiguity in the will as to *who* the intended beneficiaries of the principal should be. The issue of decedent's brother Ernest are not included as beneficiaries of the remainder. The claim of Barbara as one entitled to share in the remainder is not allowed.

(2.) *Should the distribution among the nephews and nieces entitled be per stirpes or per capita?*

The statement of proposed distribution and the supplemental notices to the parties in interest take the position that the distribution should be per stirpes. Such distribution is also contended for on behalf of Dorothy Abele Gatling, daughter of testator's deceased brother, Robert, and on behalf of Julian F. Abele, Jr.,

and Nadia B. Adele Reed, the two children of his deceased brother Julian.

A per capita distribution is urged on behalf of the four children of testator's deceased sister Elizabeth and the three children and two grandchildren of his deceased sister Mary.

A one-fourth share of the approximately $300,000 current value of the principal amounts to $75,000; a one-eleventh share about $27,200.

Does the dispositive provision plainly indicate any preference by testator for the child of his brother Robert over the four children of each of his sisters? All of these were living when the will was executed and when testator died. Only the two children of his brother Julian were born after the will was executed, and they also survive.

" 'The testator's intention is the pole star in the construction of every will and that intention must be ascertained from the language and scheme of his will; it is not what the Court thinks he might or would or should have said in the existing circumstances, or even what the Court thinks he meant to say, but what is the meaning of his words' ": Woodward Estate, 407 Pa. 638, 640; citations. See also Turner Estate, 408 Pa. 530, 534.

In construing testator's language, his words are to be given their normal, everyday meaning in the absence of evidence that testator used a dictionary personal and peculiar to himself: Hogg's Estate, 329 Pa. 163, 166. Where his words are clear, and create no ambiguity, it is both unnecessary and improper for the court to resort to rules of construction for it is axiomatic that clear, plain language needs no construction but interprets itself: Earle Estate, 369 Pa. 52, 56; Brown Estate, 349 Pa. 23, 26; England Estate, 30 D. & C. 2d 208, 211.

The second of the two paragraphs in Item Fourth of

the will provides: "And upon the death of the survivor of my said brothers and sisters to transfer, assign and pay over the principal of my said residuary estate unto such of the children and issue of deceased children of my said brothers and sisters as may be living at the time fixed for the said distribution, equally, absolutely, per stirpes."

Item Fourth is dispositive as to both income and principal. Significantly, however, disposition of the corpus is placed in a separate paragraph. While the first paragraph distributes the income primarily to brothers and sisters, equally and by way of substitution, per stirpes to the children and issue of any brother or sister who should die before the termination of the trust, these same brothers and sisters are unquestionably not intended to share in the principal. The members of the class intended primarily to receive *principal*, children of said deceased brothers and sisters, are undeniably and of necessity other than those designated to primarily receive the income. So that while the equality as to income was among brothers and sisters as a class, the equality as to principal is among nephews and nieces; the grandnephews and grandnieces taking the share their parent would have taken if living, i. e., per stirpes, by the number of families, so that each stirpes or family must equally divide the share of the ancestor, whether nephew or niece, among themselves.

Hunter, O. C. Commonplace Book, 2d ed., vol. 6, p. 257, states that "When issue are said to take *per stirpes*, it is meant that the descendants of a deceased person take the property to which he was entitled or would have been entitled if living: Words and Phrases; Shocks Estate, 271 Pa. 165; . . ." and at page 258: "Express direction that distribution be 'per stirpes' to a class and the children of any deceased; the class takes *per capita* and the children *per stirpes*":

Esbenshade's Estate, 23 Dist. R. 1069 (1914).

This gift of corpus was not to take effect until the death of the last of testator's brothers and sisters. Following this death, distribution was to be made to their *then living* "children and issue of deceased children . . . equally, absolutely, per stirpes." The "children" referred to all stand in the same relationship to testator, i. e., nephews and nieces, and as such form a class. Testator's failure to designate them as nephews and nieces is readily explained by the fact that he was not including Robert among them. However, they are all of the same generation and consequently must be deemed a *class.* "Issue of deceased children" would be of another generation or generations, however, and there is no reason to believe that testator would regard his grandnephews and grandnieces—many of them as yet unborn—with the same regard or affection as the nine nephews and nieces already in existence when he signed his will. These gifts were to go to the living members of the first class equally as absolute gifts. I cannot accept the contention of counsel for the two children of Julian Abele that testator, knowingly and intentionally, had already destroyed equality among his nephews and nieces by excluding Robert. He may well have believed that his outright gift to this only son of his deceased brother, Ernest, was both a just and an equal share. Should a member of the class of nephews and nieces fail to survive to the time for distribution, but leave issue surviving, then a share equal to that going to each of the living nephews and nieces would be passed down per stirpes. Testator has thus employed the adverb "equally" to serve a double purpose, i.e., to create equality among individuals and also equality among stirpital classes. See Ashburner's Estate, 159 Pa. 545, 547.

In Esbenshade, supra, these were the words of the will: "I give devise and bequeath all my estate real

personal and mixed unto my nephews and nieces living at the time of my decease and the issue of any of them dead per stirpes." Exceptions were taken because the court awarded a twenty-sixth share to each of the nephews and nieces instead of a one-eighth share respectively to the children of each of eight of nine surviving brothers and sisters of the testatrix.

In dismissing the exceptions the court stated, p. 1070: Her affection ". . . was not seven times as strong for the only child of one sister as it was for each of seven children of another sister. It was full for each. It was not her intention to apportion among her brothers and sisters through their children because this would have left out one who has no child. Brothers and sisters were as completely eliminated as if they were not. . . . The testatrix has distinguished each nephew and niece as a *stirpes*. If any died between the writing of her will and her death the issue of each one so dying is to take in equal shares that which her mother or father would have received. . . ."

In Rosengarten Estate, 47 D. & C. 235 (1942), the question was whether testator's grandchildren took per capita or per stirpes. The will provided that "Upon the death of the last survivor of my said children, then I direct my said Trustees to convey, assign, transfer and pay over the principal of my said residuary estate to my grandchild or grandchildren or their issue living at that time, such issue taking the share their parent would have taken if living."

At page 236, Judge Hunter, speaking for the majority of this court, observed:

"The quoted clause of the will is free from doubt. The gift is to grandchildren as one class. All stand on one plane. They are described by their relationship to testator, and are not referred to as the children of their parents, which would be the case had testator intended more classes than one. The grandchildren are

treated as individuals and not as representatives of their parents. These assurances of testator's intent become conclusive when we read the last clause of this sentence of the will whereby testator makes a substitutionary gift to the issue of grandchildren, such issue taking the share their parent would have taken if living, which shows that testator knew how to provide for representation when such was his desire."

The Supreme Court, in affirming, 349 Pa. 32, stated, pages 36, 37:

"In our opinion, what confuses this construction is that the testator substituted issue of deceased children by representation *in income* until the death of the last surviving child, and also substituted issue of deceased grandchildren by representation in such per capita share of *corpus*. . . .

"It is not unusual for a parent to give income to his children for life until the death of his last surviving child, and then to give the *corpus* to his grandchildren. Under such a testamentary plan, a gift to grandchildren as a class, of necessity, means a *per capita* distribution. A study of the philosophy underlying this principle will disclose that when a testator makes a gift to a group of individuals of the same class, he is not mentally dividing them stirpitally, and increasing or decreasing their shares depending upon the fecundity of their parent. He is thinking of each member of the class as an *individual*. Thus a gift to grandchildren, nephews, cousins, etc., as a class, connotes an equal share to each individual of the class, i.e.: per capita."

See 4 Page on Wills (Bowe-Parker Ed.), §36.8; Platt Estate, 89 D. & C. 567 (1954).

The rule is stated in 4 Page on Wills, supra, §36.12: "If the will provides for a gift to a class, and in case one or more of the members thereof shall be dead at the time at which the gift is to take effect, for a gift to the issue, descendants, and the like of such

deceased member by way of substitution, a per capita division between the original members of the class and the groups of representatives of the deceased members is indicated, together with a per stirpes distribution of the share of each separate group of representatives of deceased members as between the members of such group. Thus the issue, descendants, and the like of the deceased member will take the share which their deceased ancestor would have taken if he had lived, and only that share, and the members of such group of representatives of the deceased member will not take per capita with the surviving members of the original class": (citing, inter alia, Thorn Estate, 353 Pa. 603; Conner's Estate (No. 2), 318 Pa. 150; Patrick's Estate, 162 Pa. 175).

In England Estate, 30 D. & C. 2d 208, testator, after giving the income from a fund to his wife, children and issue of deceased children until the death of the survivor of his wife and his three named children, provided that the principal should be then distributed " 'equally amongst the children of my children, who shall then be living, and the issue of such of them as may be deceased, per stirpes, absolutely and in fee.' "

In approving a per capita distribution it was pointed out, page 213: "If we were to award a stirpital distribution we would have to disregard the use of the word 'equally'. This we cannot do.

"In Burleigh Estate, 405 Pa. 373 (1961), in which the testator also used the word 'equally', Mr. Chief Justice Bell said at page 379:

" '. . .'"Equally", prima facie, means as appellants contend, a per capita distribution among the heirs. However, appellants then admit, as they logically and under the authorities must—Love Estate, 362 Pa. 105, 66 A 2d 238—that the word "equally" means *equally among heirs of the same class*, but the issue of a deceased member of that class would not take equally

with the members of the first class, but would take per stirpes.' "

And at page 214: "If a stirpital distribution were adopted, the grandchildren, i.e., 'the children of my children' would nót all receive equal shares. On the contrary, the two surviving children of testator's son, James, would each receive twice as much principal as would their four cousins who are the children of testator's daughter, Martha, and 50 percent more than each of the children of testator's daughter, Clarissa. . . ."

So, in the instant case, if the stirpital distribution advocated by some of the nieces and nephews was adopted, the principal would not fall *"equally"* to the "children" of "my said brothers." Dorothy Abele Gatling would, as stated earlier, receive a fourth of the principal, twice as much as each of her cousins, Julian and Nadia, and four times as much as each of the children of her aunts, Elizabeth and Mary.

The contention for a per stirpital distribution among the nephews and nieces is contrary to the apparent intent of testator.

Furthermore, if there be any ambiguity in connection with the gift of the remainder, the finding of the apparent intent is fortified by and is in harmony with our statutes of descent and should be so construed: Conner's Estate (No. 2), 318 Pa. 150; Grim's Appeal, 89 Pa. 333; England Estate, supra, page 212.

In view of the foregoing, I find that testator's apparent, as well as the presumed, intent provides for a distribution of the remainder per capita among the indicated nephews and nieces living at the expiration of the trust, and per stirpes to the issue of such nephews and nieces then deceased. Awards will be made accordingly. . . .

And now, December 11, 1963, the account is confirmed nisi.

*Otis W. Erisman, Frank F. Truscott, C. Leo Sutton,* and *Frank O. Schilpp,* for exceptants.

*Hardy Williams* and *Julian A. Cook,* contra.